UNITED STATES of America,
Plaintiff–Appellee,

v.

Patricia DAVIS, Defendant–Appellant.

No. 88–2587

Summary Calendar.

United States Court of Appeals,
Fifth Circuit.

March 17, 1989.

Roland E. Dahlin, II, Federal Public Defender, Marjorie A. Meyers, Asst. Federal Public Defender, Houston, Tex., for defendant-appellant.

Frances H. Stacy, Paula Offenhauser, Asst. U.S. Atty., Henry K. Oncken, U.S. Atty., Houston, Tex., for plaintiff-appellee.

Before CLARK, Chief Judge,
JOHNSON and JOLLY, Circuit Judges.

CLARK, Chief Judge:

Patricia Davis challenges the severity of the sentence she received for manufacturing and conspiring to manufacture 22 gallons of methamphetamine with intent to distribute it. She was sentenced according to the sentencing guidelines. 18 U.S.C. § 3553. We affirm.

Patricia Davis pled guilty to manufacturing and conspiring to manufacture 22 gallons of methamphetamine with intent to distribute it in violation of 21 U.S.C. §§ 841(a)(1), 841(b)(1)(c), and 846. The sentencing guidelines grade Davis' crime at an offense level of 34, which carries a punishment range of 154–188 months in prison. On the motion of the government, the district court increased the offense level two grades to a 36 because of Davis' role as an organizer of the crime. An offense level of 36 carries a sentencing range of 188–235 months in prison. Davis was sentenced to the minimum applicable prison term for a grade 36 offense, 188 months, followed by 3 years supervised release and a $150 special assessment. Davis appeals.

Davis was sentenced pursuant to an offense level of 36. Although the term imposed, 188 months, also falls within the range of sentences for a level 34 offense, in this case Davis argues that the proper offense level was 32; she argues that the district court erred in raising the offense level on the basis that she was an organizer, and she argues that she is entitled to an additional two level reduction because of the low concentration of the drug she produced. Davis could not have been sentenced to 188 months in prison for a level 32 offense.

▮ The government argues that this court does not have jurisdiction over this appeal because the sentence imposed was not outside the arguably applicable guideline range. *See* 18 U.S.C. § 3742(a)(3). Where, as here, the defendant makes facially nonfrivolous arguments that place the given sentence outside the applicable range, the court of appeals has appellate

jurisdiction under section 3742(a)(3). We need not reach the government's contention. We also do not reach the question of whether jurisdiction could also be had under section 3742(a)(2), which grants jurisdiction where the defendant contends that the district court incorrectly applied the guidelines.

▮ The district court found that Davis was an organizer or leader in her crime, so as to warrant a two-level increase in the offense level. Guideline 3B1.1. This is a finding of fact reviewable under a clearly erroneous standard. 18 U.S.C. § 3742(d); *United States v. Mejia–Orosco*, 867 F.2d 216 (5th Cir.1989). In this case, there was more than substantial support for the court's finding. At rearraignment the following testimony was heard by the sentencing judge:

THE COURT: All right. What are the facts here in the case, counsel for the government?

MR. MEEHAN (PROSECUTOR): On December 3rd, 1987, Your Honor, Ms. Davis and Mr. Boyett, one of the co-defendants met with Robert DeMambro with the Houston Police Department. That meeting was at Industrial Chemical Supply here in Houston, and the gist of that discussion that covered something in excess of an hour was the fact that Ms. Davis was a fairly astute methamphetamine cooker looking for facilities to do that here in town.

The deal that was struck with Officer DeMambro basically indicated that there were going to be 20 pounds of methamphetamine cooked.

Officer DeMambro for his part would receive 10 and Ms. Davis would receive the other 10 because of all the glassware involved in the laboratory, since she didn't have any of that.

\*     \*     \*     \*     \*     \*

Ms. Davis' part in that essentially was as a supervisor of the set-up of the lab and lab equipment. She was responsible and played the major part in measuring the chemicals, indicating where they should go in various reaction flasks. It

was set in motion. The lab was set into motion.

\*    \*    \*    \*    \*    \*

THE COURT: Ms. Davis, is all of that true?

DAVIS: Yes, sir.

THE COURT: Is that the way that it happened?

DAVIS: Well, I didn't solicit that. Mr. Paul Mills is the one that solicited me. I am guilty of doing the cooks, you know, doing that, but he told me one of the times I went down to the chemical store that he needed to make a quick hundred thousand dollars cause D.E.A. was coming in on him. He needed an attorney. He asked me if I would help him out. I told him I would, and he said he would provide all the chemicals and a warehouse and everything if I would come down there and do this with him.

\*    \*    \*    \*    \*    \*

THE COURT: How did you make this contact with his man? How was it that you got to know him?

DAVIS: Mr. Mills?

THE COURT: Yes.

DAVIS: Through going to a store and buying chemicals, we got to be friends. He had let me have credit. He met me in the middle of the night to go buy chemicals.

THE COURT: I see.

DAVIS: You know, I paid him money under the table.

THE COURT: How did Mr. Boyett and Mr. Boyd get involved?

DAVIS: They were friends of mine.

THE COURT: Have they worked with you previously?

DAVIS: Yes, sir.

THE COURT: And what was their role in this particular case? What did they do?

DAVIS: More or less what I did.

THE COURT: I beg your pardon?

DAVIS: More or less what I did.

THE COURT: They are just with you and helping you out to get the raw materials and the chemicals you needed to do this?

DAVIS: Well, Mr. Boyd wasn't. He wasn't with me when I went down there.

THE COURT: Who was with you?

DAVIS: Mr. Boyett.

THE COURT: So he was the one that helped you. At what point did Mr. Boyd come in?

DAVIS: He came over to cook with us, the actual cooking on December 8th.

THE COURT: Did he help you?

DAVIS: Yes, sir.

THE COURT: Did all of them know what they were doing?

DAVIS: Yes, sir.

THE COURT: What was Mr. Boyett to get out of this?

DAVIS: I was going to pay him out of my share of the money.

THE COURT: How much were you going to pay him?

DAVIS: 5,000.

THE COURT: Was that the agreement?

DAVIS: Yes, sir.

THE COURT: I beg your pardon?

DAVIS: Yes, sir. I am sorry.

THE COURT: How about Mr. Boyd? He was supposed to get the same thing?

DAVIS: Yes.

THE COURT: All right. Well, I am going to accept your plea of guilty. Let me ask you, how many times had you been cooking these substances?

DAVIS: How many cooks have I been on?

THE COURT: Yes?

DAVIS: 5 to 10.

THE COURT: 5?

DAVIS: 5 to 10. I have been on some that weren't my cooks that I helped other people with.

The government argues that Davis can garner no relief from her second argument. The effect of that argument, if accepted, is a reduction of the offense level to 34. Level 34, however, prescribes a sentence of 151–188 months in prison, which encompasses the sentence received by Davis. Therefore, the government contends,

Davis' argument is frivolous, and we need not reach it. We disagree.

■ Davis' argument could afford her relief in this case. At the sentencing hearing, the district judge noted that he considered it appropriate, because of the defendant's drug habit, to impose the very lowest punishment for level 36 offenses, 188 months. This indicates that the district court might have considered an even lower sentence if a different offense level had applied. Under these facts, we cannot say that Davis could garner no relief from a two-level reduction in the offense level.

■ Reaching the merits of Davis' argument, we conclude that she is not entitled to a reduction in her offense level because of low purity level of the drug she manufactured. The guidelines provide for no such reduction. The guidelines do provide for an increase in the offense level when the government seizes drugs of unusually high purity, but this guideline provision does not create a corresponding reduction in a "weak" drug case. *See* Guideline 2D1.1 and commentary. The rationale for an upward adjustment when the drugs are unusually pure is that high purity indicates a proximity to the source of the drugs. *Id.* In this case, Davis admitted to manufacturing the drugs in question. She was the source of the drugs. The government seized 22 gallons of a substance allegedly of low purity; however, the defendant admitted at rearraignment that she had begun to manufacture 20 pounds of methamphetamine and when arrested had produced 22 gallons of a substance that was part of the process of filling that order. This supports the offense level of 34, prior to upward adjustment.

The sentence is

AFFIRMED.