**UNITED STATES of America,**
**Plaintiff–Appellee,**

v.

**Alfredo BARBONTIN,**
**Defendant–Appellant.**

**No. 89–5622.**

United States Court of Appeals,
Fifth Circuit.

July 24, 1990.

Rehearing Denied Sept. 4, 1990.

Ronald P. Guyer, San Antonio, Tex. (Court–Appointed), for defendant-appellant.

LeRoy Morgan Jahn, Asst. U.S. Atty., Helen M. Eversberg, U.S. Atty., San Antonio, Tex., for plaintiff-appellee.

Before THORNBERRY, JOHNSON, and SMITH, Circuit Judges.

JERRY E. SMITH, Circuit Judge:

A suspected leader of a Cuban drug cartel based in the San Antonio area pled guilty to the charge of aiding and abetting the possession of "a quantity of cocaine" in violation of 18 U.S.C. § 2 and 21 U.S.C. § 841(a)(1). The sentencing court assessed a four-level increase in the base offense, as allegedly authorized by the sentencing guidelines, to reflect the defendant's supervisory role in "a criminal enterprise involving five or more people." The court also imposed a two-level upward adjustment to account for the significant amount of drugs, by San Antonio standards, imported into the region by the defendant's organization.

We conclude, first, that the sentencing court failed to make a specific finding that the transaction of conviction involved, minimally, five participants. Second, the local community's intolerance to drug trafficking does not justify an upward departure from the guidelines. Accordingly, we vacate the sentence and remand.

## I.

Alfredo Barbontin was arrested several days after an associate, Candelario Valdez, was caught selling approximately 273.3 grams of cocaine to undercover San Antonio police officers. The police had organized the purchase of ten ounces of cocaine through Valdez, a known dealer, and arranged to consummate the purchase at a San Antonio restaurant.

There, officers observed Barbontin instructing Valdez and supervising the transaction. The police also witnessed Barbontin departing the restaurant with a driver, Narciso Pedro, to retrieve the drugs for the exchange. Several individuals loitered about the transaction site who, the undercover police concluded, served as lookouts for Barbontin.

Valdez was arrested at the scene of the exchange. Barbontin was arrested days later, after detectives intercepted several incriminating telephone calls made by him, which suggested that Barbontin was indeed the source of the 273.3 grams of seized drugs. Incident to the arrest, police retrieved various drug-related items from Barbontin's residence, including scales, bank records, a digital pager, and a telephone directory with numerous names and numbers.

The guidelines assign an offense level of 20 for 200–300 grams of cocaine. Guidelines § 2D1.1(c)(12). The sentencing court, however, added four levels, as provided by Guidelines § 3B1.1(a) (leader of five or more participants merits four-level increase in offense), to reflect Barbontin's aggravating role.[1] Additionally, the court elected to depart upwardly from the guidelines and assess two more levels to reflect the significant number of drugs, *by San Antonio standards*, brought into the community by Barbontin's organization.

Computing an aggregate offense level of 26, the court imposed a 78–month term of incarceration, which is the maximum available for Barbontin's category I criminal history and offense level. This term of imprisonment is 15 months more than that available had the court declined to depart from an offense level of 24 (to reflect the large quantity of imported drugs by San

---

1. At the sentencing hearing, a Drug Enforcement Agency (DEA) investigator testified that at least ten individuals were working with Barbontin in drug trafficking. The precise number of confederates who were involved *in the transaction* that led to Barbontin's indictment is uncertain.

Antonio standards), and 37 months more than that available at level 20, if aggravating factors had not been considered.

## II.

### A.

■ District courts are accorded no deference for legally incorrect applications of the sentencing guidelines, although their findings of fact merit considerable deference under the "clearly erroneous" standard of review. *See* 18 U.S.C. § 3742(e)(2) (West Supp.1990); *United States v. Otero,* 868 F.2d 1412, 1414 (5th Cir.1989) ("we review the application of the guidelines fully for errors of law"); *United States v. Mejia–Orosco,* 867 F.2d 216, 218 (5th Cir.) (sentences imposed as a result of incorrect application of guidelines must be reversed), *clarified,* 868 F.2d 807 (5th Cir.), *cert. denied,* — U.S. —, 109 S.Ct. 3257, 106 L.Ed.2d 602 (1989). In the event that the sentencing court misapplies the guidelines, we must remand the case for resentencing "with such instructions as the court considers appropriate," 18 U.S.C. § 3742(f)(1) (West Supp.1990), as we lack the authority to correct legally defective sentences on appeal. *United States v. Stephenson,* 887 F.2d 57, 62 (5th Cir.1989), *cert. denied,* — U.S. —, 110 S.Ct. 1151, 107 L.Ed.2d 1054 (1990).

■■ A sentencing court retains the authority to depart from the narrow range of incarceration provided in the guidelines. *United States v. Rivera,* 879 F.2d 1247, 1254–55 (5th Cir.), *cert. denied,* — U.S. —, 110 S.Ct. 554, 107 L.Ed.2d 550 (1989). Procedurally, however, the district court must articulate an "acceptable reason" for the departure, and the degree of departure must be "reasonable." *See* 18 U.S.C. §§ 3553(c), 3742(e) (West Supp.1990); *Mejia–Orosco,* 867 F.2d at 219, 221. Aggravating circumstances that were not adequately taken into consideration by the Sentencing Commission in formulating the guidelines may justify an upward departure. *Rivera,* 879 F.2d at 1254.

### B.

■ For those engaged in leading large criminal enterprises, the guidelines authorize the sentencing court to impose a four-level increase in the base offense "[i]f the defendant was an organizer or leader of a criminal activity that involved five or more participants or was otherwise extensive." Guidelines § 3B1.1(a). The rationale underlying this upward adjustment is rooted in the belief that leaders tend to profit more from the offense, present a greater danger to society, and are more likely to recidivate. *Id.* commentary.

At Barbontin's sentencing hearing, a DEA agent testified that his investigation of Barbontin's organization had established that he was indeed the leader of a drug-importation enterprise involving minimally ten individuals, whom the agent identified by name. The agent further added that "several" of these named subordinates were involved in the particular transaction leading to Barbontin's indictment and the instant plea bargain. Based upon this evidence and the Presentence Investigation Report (PSI),[2] the court concluded that "there [is] sufficient evidence to show that Mr. Barbontin was a leader in this criminal activity, and that it involved at least five or more participants." Consistent with the PSI's recommendation, the court assessed a four-level increase in Barbontin's base offense, which increased his potential incarceration by twenty-two months.

Barbontin objects to this upward adjustment on several grounds, one of which we find to be meritorious. Specifically, the government failed to demonstrate that a minimum of five participants were involved in the *precise transaction* underlying the conviction. The DEA agent's testimony went only so far as to state that *several*

---

**2.** The PSI suggested that Barbontin led a large Cuban drug cartel based in San Antonio. It recommended a four-level upward departure under § 3B1.1(a) but did not identify five participants in the specific transaction in question.

The PSI also suggested that the 273.3 grams seized in the transaction of conviction is small in comparison to the quantity of drugs regularly imported into the community by Barbontin's organization.

participants were involved in the transaction of conviction. The PSI similarly fails expressly to identify at least five *transactional* participants.

The commentary accompanying section 3B1.1 is silent regarding whether the particular transaction giving rise to a conviction must involve five or more participants, or whether a four-level adjustment may be imposed incident to larger drug-trafficking activities that which are not the subject of the conviction. To date, few cases from this circuit have expressly considered a district court's compliance with section 3B1.-1(a). On those occasions where a four-level increase was affirmed, the sentencing court had identified at least five *transactional participants*. *See, e.g., United States v. Rodriguez*, 897 F.2d 1324, 1326–27 (5th Cir.1990); *United States v. Garza*, 884 F.2d 181, 184 (5th Cir.1989).

In this case, the number of transactional participants is problematic. We previously have had no occasion to consider whether section 3B1.1(a)'s "headcount" may be satisfied inferentially or, stated differently, whether the sentencing court is free to consider subordinates uninvolved in the precise transaction leading to conviction, but certainly associated with the defendant.

■ In *Rodriguez*, we noted that pursuant to section 3B1.1, the sentencing court is entitled to make inferential factual determinations that we review under the clearly-erroneous standard.[3] Nevertheless, for purposes of measuring the size of the enterprise, we conclude that section 3B1.1(a) focuses upon the number of *transactional* participants, which can be inferentially calculated provided that the court does not look beyond the offense of conviction to enlarge the class of participants.

■ We agree with the government that the identities of the transactional participants need not be expressly proved for purposes of a section 3B1.1(a) departure. However, we adopt the view of other circuits that a section 3B1.1(a) adjustment is

anchored to the transaction leading to the conviction. *See United States v. Williams*, 891 F.2d 921, 926 (D.C.Cir.1989) (the offense of conviction must involve requisite number of participants); *United States v. Lanese*, 890 F.2d 1284, 1293–94 (2d Cir. 1989) (same), *cert. denied*, —— U.S. ——, 110 S.Ct. 2207, 109 L.Ed.2d 533 (1990).

■ The sentencing court is thus not at liberty to include those members of Barbontin's organization not involved in the transaction of conviction for purposes of a section 3B1.1(a) departure. However, the sentencing court is free to count the defendant himself as one "participant" in the criminal transaction. *See United States v. Preakos*, 907 F.2d 7 (1st Cir.1990) (per curiam) (may include defendant among § 3B1.1(a) participants). On remand, the sentencing court may find that at least five participants were involved in the transaction leading to Barbontin's conviction, in which case a four-level departure is in all respects appropriate.

### C.

■ Persuaded that Barbontin's organization comprised a major Cuban drug cartel, as suggested by the PSI, the sentencing court made a two-level upward departure to reflect the significant amount of drugs attributable to his organization and imported regularly into San Antonio. While admitting that the exact quantity of cocaine injected into the community by the organization was indeterminate, the court nonetheless concluded that

there were significant amount[s] of drugs brought into the community by this organization, and that Mr. Barbontin was the leader of this organization. And *by San Antonio standards*, it was a significant amount of drugs being brought into our community, so the court is going to make an upward departure in this case of two points.... [Emphasis added.]

---

**3.** For instance, the § 3B1.1(a) requirement regarding the defendant's status as "an organizer or leader in a criminal activity" may be deduced

inferentially. *See* 897 F.2d at 1326; *United States v. Davis*, 868 F.2d 1390, 1391 (5th Cir. 1989).

Recently we have stated that an upward departure from the guidelines "will be affirmed if the district court offers 'acceptable reasons' for the departure and the departure is reasonable." *United States v. Velasquez–Mercado,* 872 F.2d 632, 635 (5th Cir.) (citing *Mejia–Orosco,* 867 F.2d at 219), *cert. denied,* —— U.S. ——, 110 S.Ct. 187, 107 L.Ed.2d 142 (1989); *accord* 18 U.S.C. § 3742(e) (West Supp.1990) (departures must be reasonable). The two-level upward departure from offense level 24 to 26 translates into a potential fifteen-month extension in Barbontin's incarceration. Irrespective of the departure's arguable reasonableness, we must make the threshold inquiry of whether local community conditions or sentiment is an "acceptable reason" to depart from the guidelines. We conclude that it is not.

Barbontin persuasively argues that the quantity of drugs involved in his conviction has been fully considered by the Commission and thus no further departure is merited. The court plainly felt that the 273.3 ounces of cocaine involved in the transaction here grossly understated Barbontin's involvement with drugs generally. We recognize, as the government suggests, that large drug quantities have occasionally merited a departure from the guidelines. However, such departures are usually made under different circumstances, such as in connection with a conviction for the use of a communications facility in a drug offense,[4] or a conviction for "simple possession" where the precise drug quantity is unidentified.[5] Such cases are distinguishable on the basis that the Commission did not delimit degrees of culpability for various drug quantities associated with the particular substantive offense charged.

In this case, however, we are presented with the novel issue of whether local community sentiment may justify departure from the guidelines for aiding and abetting the possesion of 273.3 ounces of cocaine. We agree with the First Circuit that injecting community-based considerations into the guidelines would undermine Congress's goal of imposing national uniformity in sentencing. *United States v. Aguilar–Pena,* 887 F.2d 347, 352 (1st Cir.1989). It is conceivable that equally culpable criminals would receive disparate sentences, depending upon regional problems or local antipathy toward certain crimes. *Id.*

Congress plainly wished to avoid a system whereby federal judges, in solidarity with their communities, engaged in a bidding war for the severest punishment. *See id.* & n. 3. Further, were we to endorse a system of punishment in which the crime is viewed in light of local community standards, we would reinstate many of the undesirable features of disparate sentencing associated with the pre-guidelines regime.

We therefore conclude that, at least under circumstances such as those presented by the facts of this case, local community standards and sentiments regarding antisocial conduct are not acceptable justifications for departure. In addition, judicial dissatisfaction with the available sentencing range, "no matter how steeped in real-world wisdom, cannot be enough to trigger departures, lest the entire system crumble." *Id.* at 353 (citing *United States v. Lopez,* 875 F.2d 1124, 1126 (5th Cir.1989)).[6] Accordingly, we VACATE the sentence and REMAND the cause for resentencing.

So ordered.

---

4. *E.g., United States v. Williams,* 895 F.2d 435, 437–38 (8th Cir.1990); *United States v. Correa-Vargas,* 860 F.2d 35, 39 (2d Cir.1988).

5. *E.g., United States v. Crawford,* 883 F.2d 963, 964–66 (11th Cir.1989).

6. *See also United States v. Jones,* 905 F.2d 867 (5th Cir.1990) (judicial disagreement with severity of guidelines is not an adequate basis for departure); *United States v. McDowell,* 902 F.2d 451, 455–56 (6th Cir.1990) (operation of a crack house, standing alone, is not acceptable reason for departure).