**UNITED STATES of America, Plaintiff–Appellee,**

v.

**Ramona Johnston MANTHEI, Defendant–Appellant.**

No. 89–1970.

United States Court of Appeals, Fifth Circuit.

Sept. 20, 1990.

William Chambers, Fort Worth, Tex., for defendant-appellant.

J. Michael Worley, Asst. U.S. Atty., Marvin Collins, U.S. Atty., Fort Worth, Tex., for plaintiff-appellee.

Before GEE, POLITZ, and BARKSDALE, Circuit Judges.

BARKSDALE, Circuit Judge:

The primary issue in this case is whether under Sentencing Guidelines § 3B1.1(a), a court may increase a sentence for the defendant's role as an organizer or leader of extensive criminal activity, when the defendant, who was involved from manufacture through distribution of amphetamine, was convicted only for her sole participation in its distribution to one individual. Finding that the district court correctly applied the Guidelines in doing so, as well as in otherwise determining the defendant's sentence, we AFFIRM.

I.

In August 1988, after purchasing amphetamine from two other individuals, undercover police officer Ligon was introduced to Appellant Manthei. Ligon met with Manthei, her daughter, and a confidential informant in an attempt to purchase one pound of amphetamine. Manthei told Ligon that she "had been in the amphetamine business for the past eleven years and that she was careful ... in ... laundering [the money] through legitimate businesses." She said that she "was in control of [a] lab"; and "used the word, chef, which ... commonly refers to the cook, or the person that actually produces or manu-

factures the amphetamine"; and "made it very clear ... that I could acquire just ... about any quantity of amphetamine...." [1] Manthei advised Ligon that Donald Chandler (Chandler), from whom Ligon had previously purchased drugs, had called her earlier that day, requesting that she meet with Ligon.

Consistent with this, in a mid-November 1988, telephone conversation with Ligon, Manthei referred to a purchase of 15 pounds of amphetamine, which Ligon had negotiated with Chandler but which had not yet been delivered, and advised Ligon that the "speed that [Chandler] was to deliver to you the other day ... was coming from me." Manthei stated that she was "having problems at the lab site in Oklahoma, I've got electricity problems and I've got to get a generator up there so they can finish it." Accordingly, she asked Ligon to "hold off for a few days [so that] she could probably make good on the fifteen pound order." Subsequently, Manthei informed Ligon that she had heard from her people but was not able to manufacture fifteen pounds.

Earlier in November 1988, DEA Special Agent Taylor met with Manthei after an undercover informant arranged for Taylor to purchase amphetamine from her. Taylor made the purchase after Manthei stated that the price for two zip lock bags of amphetamine, each of which contained approximately one ounce, was $2,400. When Taylor asked whether the powder was fresh, Manthei replied that she had obtained it the previous weekend and that it was pure. Manthei stated that she had packaged the powder herself and added, "I do all of mine like that. I'm the only one in Fort Worth that packages that way." The two bags contained 56 grams (approximately two ounces) of 100% amphetamine hydrochloride.

At the end of November 1988, DEA agents executed a search warrant at Manthei's home and arrested her. Lab equipment and $13,500 in cash was seized. In December 1988, Manthei and Chandler were charged in a six count indictment with, *inter alia*, conspiracy to distribute amphetamine in violation of 21 U.S.C. § 846. [2]

In early February 1989, Ligon was advised that the Jefferson County, Oklahoma, Sheriff had seized a large amphetamine laboratory in mid-December 1988. Five people were arrested and convicted for participating at the lab; and several filed statements that the lab belonged to Manthei and her husband. State narcotic charges were filed against Manthei, her husband, and her daughter.

Upon being advised about the lab in Oklahoma, the DEA executed a second search warrant at Manthei's residence and found a notebook containing notes concerning chemicals and glassware supplies needed to produce amphetamine, drug transaction records containing several names, including Chandler's, and other evidence linking Manthei to the lab.

A superseding information was filed in June 1989, charging Manthei for the distribution of the two ounces of amphetamine to Agent Taylor, violating 21 U.S.C. § 841(a)(1). She pleaded guilty, and the government agreed to dismiss the indictment at sentencing. A presentence report was prepared; and Manthei objected to its calculation of the offense level, increased

---

**1.** The record on appeal includes, among other papers, the transcript of the sentencing hearing, the presentence report, and the transcript of portions of a preliminary hearing in August 1989, in *State of Oklahoma v. Gary Manthei and/or Ramona Manthei,* Case No. 89–30, 31, 32, 33, 44, 45, 46, 47 and 55 in the District Court In and For Jefferson County, Oklahoma, at which Officer Ligon, among others, testified. 18 U.S.C. § 3742(d). The Oklahoma transcript was submitted by Manthei, and she called Ligon as a witness at the sentencing hearing. The Guidelines accord the sentencing court great latitude in using information at sentencing.

"[T]he court may consider, without limitation, any information concerning the background, character and conduct of the defendant, unless otherwise prohibited by law." U.S.S.G. § 1B1.4. *See also* 18 U.S.C. § 3661.

**2.** The indictment, *inter alia,* charged that Manthei and Chandler did "distribute approximately one pound of amphetamine," in violation of 21 U.S.C. § 841(a)(1), and that Manthei did "distribute approximately 2 ounces of amphetamine," in violation of 21 U.S.C. § 841(a)(1).

for both her role in the offense and the amount of drugs attributed to her. An addendum was filed recommending that her objections be denied.

In October 1989, a sentencing hearing was held, including on Manthei's objections to the report. The report, with addendum, stated that Manthei was responsible for a total amount of amphetamine of over 7,000 grams; this included the 56 grams from Manthei, 454.49 grams from Chandler, 505 grams found at the Oklahoma lab, and 16 to 20 pounds which could have been produced from the precursor chemical found at that lab. The report also charged that she was an organizer or leader of a criminal activity involving five or more participants and that was otherwise extensive, and recommended that her base offense level accordingly be increased by four, under Guidelines § 3B1.1(a). It recommended a two-level reduction from the offense level for acceptance of responsibility, under Guidelines § 3E1.1.

Manthei objected to the increase for her role in the offense. She also objected to establishing the base offense level using 7000 grams, asserting that only the 56 grams were involved, and argued therefore that the resulting offense level should be 16 (before either reduction for acceptance of responsibility or increase for role). At the sentencing hearing, and after receiving evidence, the court adopted the findings in the presentence report and addendum, set her total offense level at 34, and sentenced her, *inter alia*, to 180 months imprisonment. Manthei timely appealed.

### II.

In accepting Manthei's guilty plea at the sentencing hearing, the district court received her acknowledgment that for the offense charged, her maximum sentence could include 20 years (240 months) imprisonment. 21 U.S.C. § 841(a) and (b)(1)(C). Pursuant to the Guidelines, including the § 3B1.1(a) increase, she received 15 years (180 months), five less than the maximum. Manthei contends that in computing her offense level at 34, the district court improperly considered evidence of other offenses for which she was not charged; that the level should instead be 14 (with a corresponding Guidelines imprisonment range of 15–21 months).

Manthei asserts that because she was charged and convicted only for the two ounce distribution, the court improperly: (1) increased her sentence for her role in the offense because no one else participated in the offense of conviction; and (2) considered amounts of drugs which were not involved in the offense of conviction. As stated, the district court acknowledged these objections at the sentencing hearing, but adopted the presentence report, including the factual finding that she was an organizer or leader of a criminal activity that involved five or more persons or was otherwise extensive, after the district court earlier found, based on the report, that "she was pretty heavily connected with all this ... and there was evidence connecting her to [the Oklahoma] lab." [3]

■ This court will "uphold the district court's sentence so long as it results from a correct application of the guidelines to factual findings which are not clearly erroneous." *United States v. Sarasti*, 869 F.2d 805, 806 (5th Cir.1989); *see* 18 U.S.C. § 3742(e)(2). Of course, we review freely legal conclusions with respect to the guidelines. *Id.; United States v. Barbontin*, 907 F.2d 1494, 1497 (5th Cir.1990).

### A.

Manthei contends that her offense level could not be increased under § 3B1.1(a), because she was the only person involved in the offense charged. The issue is whether the court may consider relevant conduct associated or connected with, or contributing to, the offense charged, or

---

**3.** Paragraph 34 ("Adjustment for Role in Offense") of the presentence report included nine persons in the "criminal activity": Manthei; her husband and daughter; Chandler; and five unnamed persons arrested at the lab and subsequently convicted. Concerning the Oklahoma state charges pertaining to the lab, paragraph 45 ("Pending Charges") named five persons (including Manthei's husband) who conspired with Manthei "and others."

just the more limited conduct falling within the definition or terms or elements of the offense charged. Placing the issue in the context of this case, was the district court correct in considering Manthei's and others' activities and roles from preparation at the lab to final distribution, or was it limited to considering only the specific final distribution by Manthei—the offense charged?

This issue is a much more narrow application of the larger threshold question faced by the Sentencing Commission in promulgating the Sentencing Guidelines— what was the scope of activities or conduct to be considered in imposing a sentence. The Commission moved from a "real offense" to a "charge offense" system. U.S.S.G. Ch. 1, Pt. A, intro., 4(a); *United States v. Foster,* 876 F.2d 377, 378 (5th Cir.1989). But, certain real offense—relevant conduct—aspects remain.

> A pure real offense system would sentence on the basis of all identifiable conduct. A pure charge offense system would overlook some of the harms that did not constitute statutory elements of the offenses of which the defendant was convicted.... The system is not, however, pure; it has a number of real elements.... [T]he guidelines, both through specific offense characteristics and *adjustments,* take account of a number of important, commonly occurring real offense elements such as *role in the offense,* the presence of a gun, or the amount of money actually taken.

U.S.S.G. Ch. 1, Pt. A, intro., 4(a) (emphasis added).

A further basis for considering relevant conduct is found in the Guidelines General Application Principles: "In many instances, it will be appropriate that the court *consider the actual conduct of the offender, even when such conduct does not constitute an element of the offense....* [T]ypically so when the court considers the applicability of specific offense characteristics within individual guidelines, [and] *when it considers various adjustments."* U.S.S.G. § 1B1.2 comment. (application n. 3) (emphasis added).

The Guidelines directs courts, *inter alia,* to consider the following relevant conduct. Section 1B1.3 ("Relevant Conduct (Factors that Determine the Guideline Range)") states in pertinent part:

> (a) *Chapters Two (Offense Conduct) and Three (Adjustments).* Unless otherwise specified, (i) the base offense level where the guideline specifies more than one base offense level, (ii) specific offense characteristics and (iii) cross references in Chapter Two, and (iv) *adjustments in Chapter Three [including § 3B1.1(a)],* shall be determined on the basis of the following:
>
> (1) all acts ... committed or aided ... by the defendant, or for which the defendant would be otherwise accountable, that occurred during the commission of the offense of conviction, *in preparation for that offense,* or ... that otherwise were in furtherance of that offense.

U.S.S.G. § 1B1.3(a)(1) (emphasis added). *See e.g., United States v. Aguilera–Zapata,* 901 F.2d 1209, 1213 (5th Cir.1990).

Part B ("ROLE IN THE OFFENSE") of such Chapter Three adjustments

> provides adjustments to the offense level based upon the role the defendant played in committing the offense. When an *offense* is committed by more than one *participant,* § 3B1.1 or § 3B1.2 (or neither) may apply.

U.S.S.G. Ch. 3, Pt. B, intro. comment. (emphasis added).[4] Section 3B1.1 ("Aggravating Role") in that chapter provides in relevant part:

> Based on the defendant's role in the *offense,* increase the offense level as follows:
>
> (a) If the defendant was an organizer or leader of a *criminal activity that involved five or more participants or*

---

**4.** "The Commentary serves a number of purposes. It may help interpret the guideline or explain how it is to be applied. *See* 18 U.S.C. § 3742; U.S.S.G. § 1B1.7. The courts will treat the commentary much like legislative history or other legal material that helps determine the intent of a drafter." U.S.S.G. § 1B1.7.

*was otherwise extensive,* increase by 4 levels.

(emphasis added). Section 3B1.1 "is designed to reflect the defendant's degree of responsibility for and amount of profit from the commission of the crime." *United States v. Velasquez–Mercado,* 872 F.2d 632, 635 (5th Cir.), *cert. denied* —— U.S. ——, 110 S.Ct. 187, 107 L.Ed.2d 142 (1989). "The [Sentencing] Commission's intent is that this adjustment should increase with both the size of the organization and the degree of the defendant's responsibility." U.S.S.G. § 3B1.1, comment. (backg'd).

Whether the defendant is an "organizer or leader in a criminal activity" for § 3B1.1(a) purposes may be deduced inferentially. *Barbontin,* 907 F.2d at 1498 n. 3; *see United States v. Rodriguez,* 897 F.2d 1324, 1326 (5th Cir.1990), *petition for cert. filed,* U.S.L.W. No. 90–5023 (June 26, 1990); *see also United States v. Mejia–Orosco,* 867 F.2d 216, 221 (5th Cir.), *cert. denied,* —— U.S. ——, 109 S.Ct. 3257, 106 L.Ed.2d 602 (1989) (court's determination under section 3B1.1(b) that "the defendant is a 'manager' or 'leader' is a finding of fact"). And, of special significance for the issue at hand, "[i]n assessing whether an organization is 'otherwise extensive,' all persons involved during the course of the *entire* offense are to be considered." U.S.S.G. § 3B1.1, comment. (application n. 2) (emphasis added). Accordingly, what does the "course of the entire offense" encompass?

### 1.

█ In coming to grips with this principal issue, we dispose quickly of Manthei's secondary contention that the district court erred in finding that she was an organizer or leader of an extensive criminal activity, arguing both that the presentence report finding was not based on credible data and that there was no evidence that the Oklahoma laboratory was linked with the offense charged. As discussed above and in Part II. B., concerning the amount of illegal drugs included in determining the offense level, the district court has greater latitude in making such findings in sentencing than it would at trial. As discussed in note 1, the findings in the presentence report are bolstered by Ligon's sentencing hearing testimony and the partial transcript of the Oklahoma hearing, both introduced by Manthei. The district court's finding was not clearly erroneous.

### 2.

█ Therefore, in light of the finding that Manthei "was an organizer or leader of a criminal activity that involved five or more participants or was otherwise extensive," we turn to whether such extensive "criminal activity" can be considered as part of the "offense," or whether the § 3B1.1(a) criminal activity to be considered is limited to the elements of the offense charged—the distribution of two ounces of amphetamine, even though Manthei was the organizer and leader of the manufacturing and other processes that resulted in the two ounces being available for that final distribution. We are satisfied that the "offense" for § 3B1.1(a) purposes includes "criminal activity" greater in scope than the exact, or more limited, activity comprising the elements of the offense charged.

While the offense charged in the superseding information was only distribution, in which Manthei was the only person charged, we do not read the Guidelines to say that events, activities and other "participants" may not be considered—that § 3B1.1(a) is precluded from coming into play. Indeed, this is a classic instance for its application. To hold otherwise is to disregard not only the plain wording, but also the clear intent, of § 3B1.1(a), as well as the other interwoven and interdependent Guidelines sections and commentary discussed above.

Section 3B1.1(a) commands a more expansive application. It addresses "criminal activity," not just that in the specific, or limited, offense charged. Moreover, it takes into account and includes "participants," as does the above quoted introductory commentary to Part B, which provides for adjustments for "an offense ... committed ... by more than one participant." Application Note 1 in the Commentary to

§ 3B1.1 defines "participant" as "a person who is criminally responsible for the commission of the offense, but *need not have been convicted.*" (Emphasis added). The Guidelines do not require that a "participant" be charged in the offense of conviction in order to be considered; they provide just the opposite. Accordingly, while the § 3B1.1(a) "offense" is the "offense charged," the scope to be considered is, where applicable, much wider—it encompasses the above discussed relevant conduct, the underlying activities and participants that directly brought about the more limited sphere of the elements of the specific charged offense.

In *United States v. Foster*, 876 F.2d 377 (5th Cir.1989), this court first approached the extent or scope of the term "offense" for § 3B1.1 purposes. The offense charged was photographing federal reserve notes; and the district court adjusted the offense level under § 3B1.3, which provides for such increase if a defendant, *inter alia*, "used a special skill in a manner that significantly facilitated the commission or concealment of the offense...." Foster's "special skill" arose out of his work with a printing press. He contended that he was charged with photographing, not printing, notes and that therefore, his printing skills were not used for the offense charged. This court agreed, holding that § 3B1.3 is not applicable unless the "skill is used to facilitate commission or concealment of 'the offense'—the one charged in the indictment—and not any other crime or crimes that may have been revealed during presentence investigation." *Id.* at 378. The court found this holding "consistent with the policy statement by the [sentencing] commission that it abandoned efforts to devise a 'real offense' system and has moved closer to a 'charge offense' system." *Id.*

Consistent with the holding in *Foster*, the activities of Manthei and the other participants prior to the offense charged in the superseding information—distribution— were for the purpose of bringing about

that distribution; and, as quoted earlier, considering such activities for § 3B1.1(a) purposes fits within one of the exceptions to the basic charge offense system utilized in the Guidelines.

This court next approached the issue here in *United States v. Barbontin*, 907 F.2d 1494 (5th Cir.1990), where the defendant received a § 3B1.1(a) increase for being the leader of a criminal enterprise involving five or more people. Testimony at the sentencing hearing was that defendant's organization involved at least 10 named individuals and "that 'several' of these named subordinates were involved in the particular transaction leading to Barbontin's indictment and ... plea bargain." *Id.* at 1497. On appeal, the defendant argued successfully that § 3B1.1(a) had been improperly applied, because "the government failed to demonstrate that a minimum of five participants were involved in the *precise transaction* underlying the conviction," with this court noting that the sentencing hearing "testimony went only so far as to state that *several* participants were involved in the transaction of conviction. The [presentence report] similarly fails expressly to identify at least five *transactional* participants." *Id.* at 1497–98 (emphasis by court).[5] This court held that in determining the number of transactional participants, a court can "not look beyond the offense of conviction to enlarge the class of participants," adding that it "adopt[ed] the view of other circuits that a Section 3B1.1(a) adjustment is anchored to the transaction leading to the conviction." *Id.* at 1498 (citing *United States v. Williams*, 891 F.2d 921, 926 (D.C.Cir.1989) and *United States v. Lanese*, 890 F.2d 1284, 1293–94 (2nd Cir.1989), *cert. denied* —— U.S. ——, 110 S.Ct. 2207, 109 L.Ed.2d 533 (1990)).

Our holding is an application of the *Barbontin* holding, as well as those of the decisions it relied upon (discussed below). The § 3B1.1(a) adjustment in this case was "anchored to the transaction leading to the

---

**5.** The court did not address whether the criminal activity "was otherwise extensive" under

§ 3B1.1(a).

conviction," because the district court incorporated and considered the very activities and persons ("participants") that directly lead to the final distribution of the amphetamine produced as a result of those activities of those persons. The district court did "not look beyond the offense of conviction to enlarge the class of participants," because the only participants, and otherwise extensive criminal activity, considered, or looked to, by the district court was that directly tied to the offense of conviction.

The *United States v. Williams* holding adopted by *Barbontin* is that "a § 3B1.1 adjustment can only be considered when the defendant has a role in the offense for which 'relative responsibility' can be allocated.... The offense of conviction itself must involve more than one participant." 891 F.2d at 926. Pursuant to the above-discussed definition of "participant," Manthei's "offense of conviction" involved several.[6]

In *United States v. Lanese*, also adopted in *Barbontin*, the offense level for Lanese was increased under § 3B1.1(b) for his being a manager or supervisor of a criminal activity that involved five or more persons or was otherwise extensive. Contending that his criminal activity did not involve that number of participants, Lanese noted that his indictment listed only four conspirators. And, the district court did not identify the participants. The Second Circuit reversed, because while the evidence showed at least five persons involved in illegal gambling operations, it did not show the requisite number involved in the charged offense, the use of extortionate means to collect illegal gambling debts. 890 F.2d at 1293. Again, here, the evidence did support the requisite extensive criminal activity in preparation for, or involved in, or underlying, the charged offense. Again, it is not necessary for partic-

ipants to be charged in the offense in order to be considered for § 3B1.1(a) purposes.

Manthei was convicted for the distribution of two ounces of drugs, drugs for which she had established an extensive manufacturing and distribution system. This was but the final link in a chain of extensive drug activities. She was linked to the lab in Oklahoma; individuals involved with it implicated Manthei and her husband as the owners. She advised Ligon that she ran the lab and was able to supply large quantities of amphetamine.

In the next link of the chain, she was involved in the distribution, and not just to the DEA agent in the offense charged. Moreover, the extent of Manthei's involvement with the entire process may be inferred from the purity of the amphetamine she distributed to the agent. *See* U.S.S.G. § 2D1.1, comment. (application n. 9) ("The purity of the controlled substance ... may be relevant in the sentencing process because it is probative of the defendant's role or position in the chain of distribution ... this factor is particularly relevant where smaller quantities are involved."). The offense of conviction involved the last link of a continuous chain of transaction in manufacturing, distributing, and retailing amphetamine. Manthei's offense level was adjusted properly under § 3B1.1(a).

### B.

Manthei contends also that the district court improperly included quantities of drugs not involved in her offense of conviction; that her base offense level, before adjustments, should have been 16, not 32.

■ "The guidelines make plain that the district court is not bound by the quantity of drugs mentioned by the indictment." *United States v. Sarasti*, 869 F.2d 805, 806 (5th Cir.1989) (citing application n. 11 (renumbered 12 as of November 1989) to Guidelines § 2D1.1). In *Sarasti*, the defen-

---

**6.** A similar holding was reached in *United States v. Tetzlaff*, 896 F.2d 1071, 1075 (7th Cir.1990), where the court stated the holding from *Williams* and held that "[a] sentencing court obviously cannot determine relative responsibility if the offense is committed by one person."

Here, "the offense [ ] was committed by [more than] one person," because while Manthei was the only person charged and convicted, the "offense [was] committed" by all of the "participants."

dant pleaded guilty to a crime involving more than 500 grams of cocaine; but the district court considered evidence that the transaction was part of a scheme that involved more than 5,000 grams. 869 F.2d at 806–07. This increased the defendant's base offense level from 28 to 32, and this court held that the district court acted properly. *Id.* at 807.

■] Similar to her secondary contention in Part II. A., Manthei asserts that the district court had "no evidence" upon which to connect her to Chandler's activities; that the "only basis . . . was uncorroborated unsubstantiated hearsay statements." However, "[t]he district court's findings about the quantity of drugs implicated by the crime are factual findings, protected by the clearly erroneous rule." *United States v. Thomas,* 870 F.2d 174, 176 (5th Cir.1989). Moreover, the court may consider any information which has "sufficient indicia of reliability." U.S.S.G. § 6A1.3, comment. And, the Federal Rules of Evidence regarding hearsay are not applicable to sentencing proceedings. Fed.R. Evid. 1101(d)(3). In a similar case, a district court relied on the probation officer's testimony. *United States v. Cuellar–Flores,* 891 F.2d 92 (5th Cir.1989). The officer had spoken with investigatory case agents and received information from law enforcement officers. The court held that this information was sufficiently reliable; that corroboration of the probation officer's testimony was not necessary. *Id.* at 93.

In this case, the district court based its findings on the presentence report, which relied upon DEA "investigative records," as well as information received from Oklahoma that implicated Manthei. As discussed, other evidence was submitted at the sentencing hearing as well, including the transcript from the Oklahoma hearing. This information had more than sufficient indicia of reliability. The district court's finding as to the quantity of drugs involved is not clearly erroneous, and the Guidelines were applied correctly in this instance.

III.

Accordingly, we

AFFIRM.