**UNITED STATES of America,**
**Plaintiff–Appellee,**

**Cross–Appellant,**

v.

**John KINGSTON, Defendant–Appellant,**
**Cross–Appellee.**

Nos. 90–5192, 90–5193.

United States Court of Appeals,
Sixth Circuit.

Argued Sept. 25, 1990.

Decided Dec. 20, 1990.

John W. Gill, Jr., U.S. Atty., Steven H. Cook, Asst. U.S. Atty. (argued), Chattanooga, Tenn., for plaintiff-appellee cross-appellant.

Jeff Dolhancyk, Anderson & Bridges, Marvin Berke (argued), Berke, Berke & Berke, Chattanooga, Tenn., for defendant-appellant cross-appellee.

Before MILBURN, BOGGS and SUHRHEINRICH, Circuit Judges.

BOGGS, Circuit Judge.

John Kingston pled guilty to one count of violating 21 U.S.C. § 841(d), possession of a "listed chemical" with the intent to manufacture and distribute a controlled substance. The United States appeals from the district court's decisions that Kingston was a "minor participant" in the crime within the meaning of the Guidelines, thus giving Kingston a two-level reduction in his offense level, and from the court's exclusion of a conviction for reckless driving from the calculation of Kingston's criminal history category because it is a "minor traffic infraction." Kingston appeals from the court's determination that he be sentenced according to the amount of the controlled substance that he would have produced had his scheme come to fruition, rather than the amount of the listed chemical he actually possessed. For the reasons that follow, we affirm the district court with respect to Kingston's appeal and reverse the court with respect to the government's appeal. We remand the question of whether Kingston was a "minor participant" to the district court for further proceedings consistent with this opinion.

I

A

Kingston's arrest and conviction arose out of his involvement with two other men in a scheme to manufacture and distribute methamphetamine ("speed"). Kingston's role, which he admitted to at the sentencing hearing, was to finance the purchase of the chemicals needed to make the speed.

The impetus for this scheme came from another participant, David Rogers. Rogers originated the idea and provided a book explaining how to make speed. The role of the third participant, Richard Wright, is unclear, although Wright was part of Rogers's scheme before the two asked Kingston to join them.

Kingston and Wright ordered the "listed chemical" involved in the crime, two kilograms of phenylacetic acid, from a medical supply store. Kingston paid for the acid in advance. Kingston subsequently returned frequently to the supply store to check on the progress of the order. When the order finally arrived, Kingston picked up the acid from the store and delivered it to Rogers's house. Kingston then agreed to finance further purchases of phenylacetic acid. Rogers ordered more acid, again paying in advance with Kingston's cash. Rogers later picked up the new order and delivered it to Wright's house. The government arrested Kingston, however, before any speed was actually made, and before the scheme had progressed any closer to completion.

B

Kingston pled guilty, and stated in his plea agreement that his case was governed by the Guidelines and that the court could impose any lawful term of imprisonment or fine. The district court found that U.S.S.G. § 2D1.1 applied to violations of § 841(d). Section 2D1.1 establishes a Base Offense Level that varies with the amount of controlled substance involved in the crime. The court, relying on statements in the presentence report (PSR), found that Kingston and his allies would have produced 500 grams of speed had their scheme come to

fruition. Kingston does not challenge that finding on appeal.

Because Kingston's crime occurred before November 1, 1989, the court applied the Guidelines in effect at the time of Kingston's crime, rather than the current Guidelines, in determining the applicable Base Offense Level. At that time, the Drug Quantity Table applicable to § 2D1.1 did not list methamphetamine. *See* United States Sentencing Commission, *Guidelines Manual*, App. C (Nov. 1989). The court therefore turned to the Drug Equivalency Tables, U.S.S.G. App. C (Nov. 1989), which state equivalencies between controlled substances not listed in the Drug Quantity Table and substances listed in the Drug Quantity Table. The Drug Equivalency Tables established that one gram of methamphetamine was equivalent to two grams of cocaine for sentencing purposes. Thus, the court used 1,000 grams of cocaine for sentencing, leading to a Base Offense Level of 26 under the old § 2D1.1.

The court then subtracted two levels under U.S.S.G. § 3B1.1 because it found Kingston was a "minor participant" in the scheme. The court also subtracted two additional levels because Kingston accepted responsibility for his crime by pleading guilty. The United States does not appeal from this latter determination. Thus, the court found that Kingston's final Offense Level was 22.

The court then determined Kingston's criminal history level. The PSR stated that Kingston had two criminal history points: one for a conviction for possession of marijuana and one for a conviction for reckless driving. Two criminal history points place a defendant in criminal history category II. The district court found that reckless driving should be excluded from the calculation of Kingston's criminal history because it is a "minor traffic infraction," and thus excluded under U.S.S.G. § 4A1.2(c). This exclusion reduced his criminal history point total to one, thereby reducing his criminal history category to I.

The sentencing range under the Guidelines for a defendant with an offense level of 22 and a criminal history category of I is 41 to 51 months. The court sentenced Kingston to 41 months of imprisonment. Both parties then appealed.

## II

██ The first, and most intricate, of the appeals before us is Kingston's. Kingston contends that the court should never have examined the Drug Equivalency Tables in determining his Base Offense Level because his violation should be punished according to the amount of the listed chemical he possessed, not the amount of methamphetamine that he could have produced.[1] As we shall see, this argument, although quite interesting, misinterprets U.S.S.G. § 2D1.1.

The crux of the problem is this: violators of § 841(d) have not sold or made any controlled substances, but § 2D1.1, which the Guidelines dictate be followed in sentencing violators of § 841(d), United States Sentencing Commission, *Guidelines Manual*, App. A (Nov. 1989), fixes sentences based solely by the amount of controlled substance involved in the offense. As Congress intended to punish severely the possession of listed chemicals with the intent to manufacture controlled substances, having provided a maximum of ten years' imprisonment for violators, courts should interpret these provisions to arrive at a fair method of assessing meaningful punishment.

Kingston contends that a fair method would necessarily look to the amount of the listed chemical involved in the offense because he was convicted for possession of a listed chemical. Kingston notes that § 2D1.1 establishes Base Offense Levels for both named and unnamed controlled substances. Kingston then notes the statu-

---

1. Kingston also contends that the district court did not apply § 2D1.1, but rather applied § 2D1.4, the Guideline section applicable to violations of 21 U.S.C. § 846. Section 846 punishes attempts or conspiracies to manufacture a con-
trolled substance. This contention is wholly without merit because the PSR explicitly stated that it was applying § 2D1.1 in its recommendation, and there is no indication that the court was not using the PSR's recommendation.

tory definition of "controlled substances": "[A] drug or other substance, or immediate precursor, included in schedule I, II, III, IV, or V of part B of this subchapter." 21 U.S.C. § 802(6). Although phenylacetic acid is not listed in any of the schedules, Kingston surmises that phenylacetic acid must be punishable as an "other Schedule I or II controlled substance[ ]," U.S.S.G. App. C (Nov. 1989), because phenylacetic acid is a precursor chemical for methamphetamine and "immediate precursors" are part of the definition of "controlled substance." He argues that "precursor chemical" must be included in the phrase "immediate precursor" used in the § 802(6) definition of "controlled substance," because otherwise Congress would have created a crime for which the Guidelines provide no punishment. Thus, violations of § 841(d) must be punished according to the Base Offense Level used for controlled substances not specifically listed in the Drug Quantity Table. In Kingston's case, two kilos of phenylacetic acid were involved, translating in his theory of punishment into a Base Offense Level of 12.

This theory is attractive, because it solves a rather glaring problem in the promulgation of the Guidelines. We nevertheless reject Kingston's theory because we believe that it is contrary to the statutes involved, and because we believe that punishing violations of § 841(d) according to the amount of controlled substances that would have been involved had the plan progressed is more in line with the spirit of the laws.

The first reason Kingston's argument fails is that "immediate precursor" is a defined term that does not include every chemical precursor. "Immediate precursor" is defined in 21 U.S.C. § 802(23) as a substance:

(A) which the Attorney General has found to be and by regulation designated as being the principal compound used, or produced primarily for use, in the manufacture of a controlled substance; (B) which is an immediate chemical intermediary used or likely to be used in the manufacture of such controlled substance; *and* (C) the control of which is

necessary to prevent, curtail, or limit the manufacture of such controlled substance.

The referenced regulations appear at 21 C.F.R. § 1308.12(g), and the Attorney General has not listed phenylacetic acid in them. Thus, phenylacetic acid cannot be an "immediate precursor" to methamphetamine.

Kingston could easily have been confused by the similarity between "precursor chemicals" and "immediate precursors." An "immediate precursor" is the chemical that can be directly transformed into the controlled substance. Methamphetamine's "immediate precursor" is P2P (Phenyl-2–propanone). A "precursor chemical" is any chemical involved at any stage in the production of a controlled substance. In this case, phenylacetic acid is used to make P2P. Thus, despite the confusion, the two terms are easily distinguishable.

Kingston's argument is also belied by the Drug Quantity Table. All of the drugs listed in the Table are controlled substances. None of the "listed chemicals" from 21 U.S.C. § 802(34) is included in the Table. If the Commission had actually intended to punish less severely convictions under § 841(d) where no controlled substance was directly involved in the offense, it could easily have added to the Table specified amounts of "any listed chemical." That it did not do so suggests that Kingston's theory was not adopted, explicitly or implicitly, by the Commission.

This discovery, however, does not solve our problem. We still must ascertain a method whereby violations of § 841(d) can be punished under U.S.S.G. § 2D1.1. We believe that the method advanced by the Government, basing the sentence on the amount of the controlled substance that would have been involved in the crime had the scheme advanced, is the fairest way to reconcile § 841(d) and U.S.S.G. § 2D1.1.

We begin by noting that § 841(d) criminalizes possession of a listed chemical *only* if there is an intent to use that chemical to manufacture a controlled substance. Mere possession of phenylacetic acid alone is not

illegal. Congress underscored this focus on the controlled substance by placing this law in § 841. Section 841 is the most important section limiting the use of controlled substances. It criminalizes the manufacture, distribution, dispensation, or the possession with the intent to do any of the above acts, of any controlled substance. 21 U.S.C. § 841(a). The inclusion of language criminalizing possession of a listed chemical with the intent to manufacture a controlled substance in § 841 suggests that this prohibition is also intended to be a central part of Congress's scheme to limit controlled substances. Thus, it is fair that violations of § 841(d) be punished with respect to the amount of the controlled substance that the government is seeking to limit.

This approach is confirmed when we compare the purpose and method of punishment of § 841 to that of § 846, the attempt and conspiracy provision of the Federal controlled substances limitation effort. The purpose of the Federal effort is to control the distribution, and thus indirectly the use, of certain chemical substances. Thus, § 841(a) makes distribution and sale illegal, and § 846 tries to prevent the substances from ever being created by making the attempt to create them illegal. Section 841(d) moves this system of control even further back in time by preventing persons from even getting close to creating the substances. Section 841(d) is thus effectively an attempt statute that penalizes acts earlier in the process of manufacturing controlled substances.

Violations of § 846 are punished with reference to the amount of controlled substance that would have been involved had the attempt been successful. U.S.S.G. § 2D1.4. In fact, the same Drug Quantity and Equivalency Tables used in § 2D1.1 are also used in § 2D1.4. As both § 841(d) and § 846 have the same object, limiting access to controlled substances by criminalizing attempts to create them, it is sensible that they both be punished according to the same principles.

We are aware that no other circuit has previously considered the application of

§ 2D1.1 to violations of § 841(d). We note, however, the consistent application of our theory of punishment to cases involving § 846. The Tenth Circuit in *United States v. Havens*, 910 F.2d 703, 705–06 (10th Cir. 1990), recently found that this method of estimating the amount of controlled substance involved in an offense was proper under § 846. The court noted that the defendant pled guilty to attempted manufacture of methamphetamine, but wanted to be sentenced "for only the trace amounts of finished drugs found with the precursor chemicals.... [This] is inconsistent with his guilty plea to *attempt* to manufacture. Defendant had not 'attempted' to produce the completed drugs actually found." *Id.* at 705. This reasoning is directly applicable to Kingston's guilty plea here. Kingston pled guilty to possession *with intent to manufacture* a controlled substance. He did not intend to manufacture the two kilos of phenylacetic acid. He intended to use the acid to manufacture a certain amount of speed. Just as Havens was sentenced based on the estimated quantity of methamphetamine he intended to produce, so too should Kingston be sentenced according to his intent.

Other circuits in § 846 cases have estimated the amount of methamphetamine which could have been produced based on the amount of precursor chemicals discovered at the laboratory site. *See United States v. Manthei*, 913 F.2d 1130, 1133, 1137–38 (5th Cir.1990); *United States v. Touby*, 909 F.2d 759, 773 (3d Cir.1990); *United States v. Wagner*, 884 F.2d 1090, 1097–98 (8th Cir.1989).

■ One question still remains at this point in the analysis. Kingston could still argue that a lower Base Offense Level is appropriate for his crime even under our theory of punishing violators of § 841(d). He could argue that since methamphetamine is a Schedule II substance, *see United States v. Schrock*, 855 F.2d 327, 331–32 (6th Cir.1988), and was not listed in the Drug Quantity Table at the time he committed his crime, offenses involving methamphetamine should be penalized based on

the offense levels for "other Schedule II substances."

This argument should also fail because of the existence of the Drug Equivalency Tables. The Tables come into use only when a controlled substance is not listed in the Drug Quantity Table. Methamphetamine is listed in the Drug Equivalency Tables as being equivalent to cocaine. The "other" Schedule II substances referred to in the Drug Quantity Table must therefore be those Schedule II substances listed in neither the Drug Quantity nor the Drug Equivalency Tables.

This line of analysis is further bolstered by the recent amendments to the Sentencing Guidelines. Methamphetamine is now listed in the Drug Quantity Table. Had Kingston committed his offense after the amendments had been adopted, his Base Offense Level would be 28. Our theory of interpreting § 2D1.1 gives Kingston a Base Offense Level of 26, while Kingston's theory would give him a Base Offense Level of 12. The small difference between 28 and 26 suggests that methamphetamine was never intended to be punished under the offense levels attached to "other" Schedule II substances.

Accordingly, the district court's determination that Kingston's Base Offense Level should be 26 is affirmed.

### III

■ We now address the first of the government's contentions. U.S.S.G. § 4A1.2(c)(2) permits the exclusion of certain criminal convictions from the calculation of a defendant's criminal history provided they are, or are similar to, certain listed offenses. Those offenses are hitchhiking, juvenile status offenses and truancy, loitering, vagrancy, public intoxication, and "minor traffic infractions." U.S.S.G. § 4A1.2(c)(2). The district court excluded Kingston's Tennessee conviction for reckless driving "because the guidelines aren't too clear on this, and because of the flexibility in the term 'minor traffic *offense'* ... I think it's appropriate here to give the Defendant the benefit of the doubt." (emphasis supplied). The government con-

tends on appeal that this finding is incorrect because "infraction" is a defined term that cannot include Kingston's reckless driving conviction.

The government argues that the statutory definition of "infraction" is an offense punishable by a maximum of "[f]ive days or less, or ... no imprisonment." 18 U.S.C. § 3559. Reckless driving is punishable in Tennessee by a maximum jail term of 90 days. Tenn.Code Ann. § 55–10–205. Kingston's counsel also conceded this at oral argument.

We agree with the Ninth Circuit's determination in *United States v. Aichele*, 912 F.2d 1170 (9th Cir.1990), that as a matter of law reckless driving is not a "minor traffic infraction" under the Guidelines. The *Aichele* court noted that U.S.S.G. § 1B1.9 also defines "infraction" as an offense with a maximum term of imprisonment of five days or less. Kingston has offered no alternative interpretation of the word "infraction," relying instead on his actual penalty—a $50 fine—and observations that other traffic infractions have greater punishments than does reckless driving to support its exclusion. We are persuaded that the Guidelines use "infraction" as a term of art, and do not intend courts to weigh the relative seriousness of traffic offenses when deciding which convictions to exclude from criminal history calculations. We therefore reverse the district court's exclusion of Kingston's reckless driving conviction. This will result in Kingston having a criminal history score of two, and thus a criminal history category of II.

### IV

■ U.S.S.G. § 3B1.2(b) authorizes a district court to reduce the defendant's final offense level by two if the defendant was a "minor participant" in the offense leading to conviction. The district court found that Kingston was a "minor participant" without hearing any proof from either party in support of that contention, relying solely on the PSR's determination that Kingston was "entitled" to "minor participant" status. We agree with the government's con-

tention that our intervening decision in *United States v. Rodriguez*, 896 F.2d 1031 (6th Cir.1990), requires reversing this decision.

We held in *Rodriguez* that a defendant must prove by a preponderance of evidence entitlement to a downward revision of the appropriate offense level. *Rodriguez*, 896 F.2d at 1032–33. We reached this conclusion, in accord with the Fourth Circuit in *United States v. Urrego–Linares*, 879 F.2d 1234 (4th Cir.1989), because "the burden of proof is ordinarily placed upon the party who benefits from the establishment of a fact." *Rodriguez*, 896 F.2d at 1033. In so holding, we expressly overruled the holding in *United States v. Dolan*, 701 F.Supp. 138 (E.D.Tenn.1988), to the contrary.

Kingston raises two procedural arguments that purportedly prevent the government from making this argument. Kingston first alleges that the government did not comply with Local Rule of Practice 27.3, which requires any objection to a probation officer's report to be supported by affidavits. Also, Kingston contends that the government did not object to the PSR prior to the sentencing hearing, as it presumably was required to do.

We reject both of these arguments. We do not ordinarily enforce local rules of practice when the district court, as here, does not enforce them. We decline to alter our practice now.

We also will not resolve a dispute between the parties regarding whether the government did object to the PSR before the sentencing hearings. The government says that it did file the objection, while Kingston says it did not. Kingston provides no proof in support of his contention, but the district court was surprised that the government had an objection because the PSR stated that the government had no objections. The government contends that the PSR statement was a mistake: since the government rarely objects to PSRs, the probation officer assumed it was not objecting to this PSR. In response to the court's surprise, the government read at the sentencing hearing from what it said was a letter dated November 3, 1989, ob-

jecting to the classification of Kingston as a "minor participant." Since this issue was not raised by Kingston at the sentencing hearing, we decline to resolve this essentially factual dispute at this time. Kingston is free to raise his contention before the district court upon remand.

### V

We therefore AFFIRM the district court with respect to its determination of Kingston's Base Offense Level. We REVERSE the district court's decisions concerning the exclusion of Kingston's reckless driving conviction and the determination that Kingston was a "minor participant" in the scheme. We REMAND to the district court for further proceedings consistent with *Rodriguez* in order to provide Kingston with the opportunity to prove that he is entitled to "minor participant" status.