UNITED STATES of America, Appellee,

v.

Antonio PERRONE, Ramon Emilio Gomez and Israel Perez, Defendants,

Antonio Perrone and Ramon Emilio Gomez, Defendants–Appellants.

Nos. 1421, 1386, Dockets 90–1630, 90–1669.

United States Court of Appeals, Second Circuit.

Argued May 16, 1991.

Decided June 13, 1991.

---

Robin W. Morey, Asst. U.S. Atty., New York City (Otto G. Obermaier, U.S. Atty., S.D.N.Y., Daniel C. Richman, Asst. U.S. Atty., New York City, of counsel), for appellee.

Vivian Shevitz, New York City (Georgia J. Hinde, New York City, of counsel), for defendant-appellant Gomez.

Melvin K. Roth, Mineola, N.Y., for defendant-appellant Perrone.

Before LUMBARD and CARDAMONE, Circuit Judges, and LASKER, District Judge.[*]

LASKER, District Judge.

Ramon Emilio Gomez and Antonio Perrone appeal from their convictions of one count of participating in a narcotics manufacturing conspiracy in violation of 21 U.S.C. §§ 841(a)(1) and 846 (1988) and of a second count of possession of "listed chemicals" (acetone and ether) with an intent, or knowledge, or reasonable cause to believe that the chemicals would be used to manufacture cocaine, in violation of 21 U.S.C. §§ 802(33), 802(35), 812, 841(a)(1), 841(d)(1), 841(d)(2) (1988) and 18 U.S.C. § 2 (1988). Although no cocaine was seized at the time of their arrest, Gomez and Perrone were sentenced respectively to 126 and 140 months' incarceration and additional supervised release on the assumption, derived from the amount of cocaine that theoretically could have been refined using the chemicals at their disposal, that the object of their conspiracy was to refine over five kilograms of cocaine.

Gomez challenges his conviction as based upon insufficient evidence. Perrone challenges his conviction as supported by improperly admitted expert testimony concerning the "typical" practices of drug traffickers, as well as by the allegedly improper use of and prosecutor comment on statements he made during plea bargaining discussions with the United States Attorney's office. Perrone also challenges his conviction on the theory that his motion to suppress the chemicals and the items seized from Apartment 51 of 517 West 135th Street in Manhattan should have been granted. Both Perrone and Gomez also challenge the calculation of their sentences.

We reverse the conviction of Gomez as not supported by sufficient evidence. We affirm Perrone's conviction as to Count 2, but for reasons discussed below vacate as to Count 1 and remand the case for resentencing consistent with this opinion.

## BACKGROUND

Deciding all factual inferences in the government's favor, the jury could have found the following facts.

On the morning of January 9, 1990, Drug Enforcement Administration (DEA) agents conducted surveillance of a chemical company in Mount Vernon, New York. The agents observed Gomez, Perrone and Israel Perez arrive in two vehicles, enter the chemical company, emerge five minutes later with prominently labelled boxes containing 32 gallons of acetone and four five-gallon drums, also clearly marked, of ethyl ether, and load the chemicals into a brown van. Perrone drove the van away with

* Hon. Morris E. Lasker, Senior District Court Judge of the United States District Court for the Southern District of New York, sitting by designation.

Gomez as his passenger, and Perez drove away in the Toyota in which he had arrived.

The agents followed the two vehicles, which periodically accelerated and slowed while on the Cross Bronx Expressway. The vehicles eventually were parked in a garage between 520 and 536 West 135th Street in Manhattan. Perrone and Gomez entered a store run by Perrone's family (and where Gomez was employed) at 501 West 135th Street ("the bodega"). They spent the day partly at the bodega and partly in an apartment building at 517 West 135th, at which Gomez changed clothes on one occasion. Just after 4:00 p.m., Perrone drove the Toyota, with Perrone following in the van, out of the garage and down the block in an uneven, halting and apparently evasive manner. Perrone, with Gomez still following, then made a U-turn and parked in front of the apartment building at 517 West 135th, across the street from the garage from which they had emerged.

Once the vehicles were parked, Perrone, Gomez and two others unloaded the acetone. Perrone and the others brought the acetone into the apartment building while Gomez remained outside. Perrone emerged with black plastic trash bags, which Gomez placed over the drums of ether as he unloaded them. The others carried the ether into the building. The van was unloaded within five minutes, after which DEA agents arrested those involved as they began to depart.

Perrone was arrested as he started to leave in the Toyota. He had some keys in his pocket and had a beeper. Gomez was observed outside the bodega by an agent, who followed him into the bodega and placed him under arrest. Upon the agent's approach, Gomez protested that he had been working at the store all day. He also told the agent he lived in a first floor apartment at 517 West 135th.

Following the arrests, the agents sought warrants to search Apartment 51, the store, the Toyota and the van. The agents entered the apartment before receiving any warrant, observed the chemicals within and conducted a "protective search," which was made known to the Magistrate Judge who issued the warrant. Additionally, the Magistrate Judge was informed that the van used to transport the chemicals was registered to Apartment 51 and that Consolidated Edison listed the apartment's telephone contact to be the telephone number at Perrone's bodega. Based on this information, a warrant was issued after the agents' initial search of the apartment. From the apartment, the agents seized items including the chemicals unloaded by the defendants, a coat they believed Gomez had worn earlier that day, papers belonging to Perrone, Perrone's wallet, and a large bag containing several items typically used in cocaine processing, including an Ohaus triple-beam balance scale, some laboratory glassware, aluminum foil, plastic bags, duct tape, knives and two canisters of a type used to form cocaine bricks. Among the papers seized were two photographs of people including Gomez at a New Year's party at the bodega. The apartment also contained a handgun-cleaning kit, ammunition, and walkie-talkies, although no gun was found and the only gun associated with any of the defendants belonged to Perrone's brother, was legally registered, and was kept at his family's bodega. No cocaine, money, or weapons were found in the apartment, and none of the items seized was tied to Gomez, with the possible exception of the coat which an agent stated Gomez had worn earlier that day and the photographs of party scenes including Gomez. A "recipe", or list of items needed for cocaine refining, was found in Perrone's wallet. Judge Stanton instructed the jury not to consider items taken from Perrone as evidence against Gomez.

No items of consequence were discovered in searches of the van, the Toyota, or the bodega.

Perrone testified in his own defense. He stated that his family rented Apartment 51, and that he and his brother used it as a place to "hang out," but not as a primary residence. He testified that on January 2, 1990, one Jose Miguel Santiago offered to

pay Perrone, Gomez and Perez a few hundred dollars to pick up boxes in Mount Vernon, a task whose purpose Perrone on cross-examination conceded to be "suspicious." Perrone testified further that Santiago at that time gave Perrone the bag containing the items later found in Apartment 51, as well as the address of the Mount Vernon chemical company, the list of items to be acquired, and the plastic trash bags that later were placed over some of the chemical containers while they were being unloaded.

On cross-examination, Perrone acknowledged having attended three proffer sessions at the United States Attorney's Office in an attempt to cooperate with the Government. He denied repeatedly that he made certain incriminating admissions during those sessions, although he did acknowledge offering to assist the DEA by setting up a multi-kilogram sale of cocaine.

Gomez presented three witnesses in his defense. His sister testified that their brother Ramon Miguel lived at 517 West 135th and that Gomez sometimes stayed overnight there. Gomez's sister-in-law, Juana Gomez, testified that on January 9 Gomez came to her first-floor apartment, bathed, changed clothes, ate lunch, played with her children and left. Another witness stated that he had planned to meet Gomez that afternoon to lend him money, but cancelled the meeting because he failed to obtain the funds.

In rebuttal, the government offered the testimony of a DEA agent that Gomez told him his brother Ramon Miguel lived with Gomez on 148th Street. Another agent testified as to the three proffer sessions which he attended with Perrone. The agent testified that initially Perrone claimed to have obtained the chemicals elsewhere, but that in subsequent meetings he acknowledged acquiring them in Mount Vernon with Gomez and Perez. According to the agent, Perrone also stated in the proffer sessions that their acquisition of the chemicals was at the behest of one Santiago, whom Perrone knew to be involved with drugs, and that Santiago was expected to bring the drugs to their apartment that evening for refining. Finally, the agent testified that at the final proffer meeting Perrone offered to arrange a "multi-kilo" sale of cocaine to DEA agents.

Gomez called one rebuttal witness, his brother Ramon Miguel Gomez, who testified to explain inconsistent testimony about his address. Ramon Gomez stated that on January 9, 1990, he and his wife were separated, and he was living on 148th Street while his wife and children remained on 135th. He expressed his belief that his sister during her testimony had forgotten that he and his wife had been separated on January 9, 1990.

Based on this evidence, the jury convicted Perrone and Gomez June 15, 1990 following a five-day trial.

## DISCUSSION

### I.

#### A. Gomez

Gomez was convicted pursuant to 21 U.S.C. § 841(d) of knowing or intentional possession of listed chemicals with an intent to manufacture a controlled substance, or with reasonable cause to believe that the chemical will be used to manufacture a controlled substance, and pursuant to 21 U.S.C. §§ 841(a)(1) and 846 of conspiracy to manufacture cocaine.[1]

Gomez argues that there was insufficient evidence as to the knowledge or intent ele-

---

1. 21 U.S.C. § 841(d) provides:
   Any person who knowingly or intentionally—
   (1) possesses a listed chemical with intent to manufacture a controlled substance ...; (2) possesses or distributes a listed chemical knowing, or having reasonable cause to believe, that the listed chemical will be used to manufacture a controlled substance.... (shall be subject to fines or incarceration).
   21 U.S.C. § 846 provides:

Any person who attempts or conspires to commit any offense defined in this subchapter shall be subject to the same penalties as those prescribed for the offense, the commission of which was the object of the attempt or conspiracy.

§ 841(a)(1) in turn provides that it is unlawful: to manufacture, distribute, or dispense, or possess with intent to manufacture, distribute, or dispense, a controlled substance.

ments of the two offenses. We agree. Although the evidence clearly established his physical involvement, we conclude that no reasonable juror could decide beyond a reasonable doubt that Gomez knowingly or intentionally possessed the chemicals with intent to manufacture a controlled substance or that he had reasonable cause to believe that they would be used for that purpose.

It is true of course that "[w]hen reviewing challenges to the sufficiency of evidence, a federal appellate court views the evidence in a light most favorable to the government, construing all permissible inferences in its favor." *United States v. Berkery*, 919 F.2d 817, 820 (2d Cir.1990) (citing *Glasser v. United States*, 315 U.S. 60, 80, 62 S.Ct. 457, 469, 86 L.Ed. 680 (1942)). Moreover, Gomez's conviction "must be upheld if '*any* rational trier of fact could have found the essential elements of the crime beyond a reasonable doubt.'" *United States v. Maldonado–Rivera*, 922 F.2d 934, 979 (2d Cir.1990) (quoting *Jackson v. Virginia*, 443 U.S. 307, 319, 99 S.Ct. 2781, 2789, 61 L.Ed.2d 560 (1979) (emphasis in original)).

The verdict in a conspiracy prosecution must be supported by "some evidence from which it can reasonably be inferred that the person charged with the conspiracy knew of the existence of the scheme alleged in the indictment and knowingly joined and participated in it." *United States v. Labat*, 905 F.2d 18, 21 (2d Cir.1990), although participation "with the requisite criminal intent may be established through circumstantial evidence." *Id.*

Drawing from the government's brief, which marshalled the evidence against Gomez as thoroughly as possible, the following facts pertain to him:

1) *Gomez's role in transporting the chemicals*—Gomez along with two others picked up the chemicals from the chemical company, which the government argues indicates his substantial involvement because the others trusted him enough to reveal their source of chemicals.

2) *Gomez's surreptitious behavior*—After the materials had been transported to a garage in Manhattan, Gomez drove the van containing them, following the Toyota driven by Perrone, along a circuitous route including several stops and a U-turn before parking at the apartment building at 517 West 135th Street. Moreover, when Gomez unloaded the van, he placed the bright blue five gallon drums of ether in black trash bags.

3) *Gomez's knowledge of what he was transporting*—The containers were clearly marked "ether" and "acetone." While Gomez does not speak English, according to the Government the Spanish words for those substances are similar to the English, and accordingly Gomez should have known what he was transporting.

4) *Gomez's ties to Apartment 51*—The government argues that the presence of what DEA agents testified was Gomez's coat in the apartment in which the materials were seized, as well as the presence of two photographs of Gomez and several others in that apartment, indicate his "significant ties" to that apartment and knowledge of drug activities that occurred within.

5) *Gomez's false exculpatory statement*—Upon his arrest, Mancini testified that Gomez protested that he had been working at the nearby bodega all day.

One count of Gomez's indictment alleged a conspiracy to manufacture over five kilograms of cocaine, and acts in furtherance of that conspiracy of possessing listed chemicals with an "intent to manufacture" cocaine. The second count alleged possession of the chemicals with an intent to manufacture cocaine, knowing and having reasonable cause to believe that the chemicals would be used to manufacture cocaine. Despite the strong presumption of the validity of jury verdicts, in Gomez's case there is not an adequate basis to conclude beyond a reasonable doubt that he possessed the intent requisite to support a conviction on either count.

The government contends that Gomez's "surreptitious behavior," namely his driving in a manner to evade detection and his placing some of the chemicals in plastic bags before unloading them, is evidence of

his knowledge that he was engaged in narcotics trafficking. *See United States v. Young*, 745 F.2d 733, 753 (2d Cir.1984), *cert. denied* 470 U.S. 1084, 105 S.Ct. 1842, 85 L.Ed.2d 142 (1985) ("surreptitious fashion" in which bag was transferred from car is a factor supporting inference of defendant's involvement in narcotics transaction). *Young*, however, is distinguishable on its facts. There a meeting was arranged by a telephone call from the defendant's home, with the defendant suggesting a location for the meeting; conversations in which the defendant engaged were described as "guarded," his and others' behavior described as "unusual," and the transfer of a bag from the trunk of one vehicle to another described as "surreptitious." *Young*, 745 F.2d at 753. All these factors in addition to expert DEA testimony were deemed to be circumstantial factors which when taken together adequately supported a jury inference that the transaction described was a narcotics transaction. *Id.*

Here, by contrast, the behavior which the government argues is "surreptitious" was in fact consistent with Gomez's usual duties as an employee of Perrone's bodega, was not inconsistent with Gomez's lack of knowledge or intent ultimately to manufacture cocaine, and at any rate was not fairly attributable to Gomez. Gomez's "evasive" driving tactics occurred only while he was following Perrone. He placed the ether drums in plastic bags only when Perrone handed him the bags, and this action may be innocently explained by the fact that one drum was leaking. Moreover, Gomez did nothing to conceal the clearly labelled acetone boxes which he had unloaded just before.

The fact that Gomez was "entrusted" with the knowledge of where Perrone was to obtain chemicals has no plausible significance. The "entrusting" alone would not have alerted Gomez to the fact that the errand was illicit.

There was no evidence of Gomez's knowledge that either acetone or ether is used to process cocaine. Moreover, given his lack of knowledge of English and his minimal literacy in Spanish there was not an adequate basis for finding that he understood the labels on the containers.

The evidence as to Gomez's ties to Apartment 51 was tenuous and was insufficient to support an inference of his knowledge that other drug refining equipment was stored in the apartment, particularly since that equipment was stored in a bag. The presence in the apartment of photographs of Gomez in a group of people had minimal probative value. The presence of a coat which an agent testified Gomez wore that day, although plausibly contradicted by Perrone's testimony that he had worn it and Gomez's sister-in-law's testimony that Gomez had worn a leather jacket and later a denim jacket, might render permissible a jury inference that he had been to the apartment, but would not tie Gomez to nonobvious items stored within it.

As to Gomez's "false exculpatory statement," [2] it was not useable as direct evidence of his guilt. *See United States v. Di Stefano*, 555 F.2d 1094, 1104 (2d Cir. 1977) (plain error warranting reversal to instruct that false statements indicating "consciousness of guilt" could be used as "circumstantial evidence of the defendant's guilt" where other evidence against the defendant was weak). Moreover, the dependability of the agent's account that Gomez disclaimed his presence was undermined by the fact that Gomez's English was extremely limited and the agent spoke no Spanish. Here the jury was not charged as to the limited purposes for which it could consider Gomez's statement. Just as was true of the defendant in *United States v. Nusraty*, 867 F.2d 759, 765 (2d Cir.1989), Gomez's statement was consistent with the innocent proposition that he "felt the need to disassociate himself" from criminal activity with which he surmised he was implicated.

---

**2.** Given the deference due to jury verdicts on appeal, we accept as true the agent's account of Gomez's statement. However, there is a high likelihood of inaccuracy due to Gomez's extremely limited English and the agent's nonexistent Spanish.

The government argues that Gomez could only have failed to know the purpose of acquiring the chemicals by conscious avoidance, which would be sufficient to establish requisite knowledge. The government supports this claim by referring to Perrone's testimony that when Miguel Santiago "recruited" Perrone, Gomez and Israel Perez to pick up the chemicals, Gomez was present, and Perrone's statement that "we" had been "suspicious" of Santiago's purpose. At the same meeting, the "recipe," certain cocaine distribution paraphernalia, and laboratory glassware were given to Perrone.

Gomez's presence at an occasion at which Santiago hired Perrone to acquire certain items and Perrone's testimony that he (Perrone) was "suspicious" about the purpose of his mission provide an inadequate basis to conclude that Gomez either knew of the purpose of those activities or consciously avoided such knowledge. Perrone's general comment during his testimony that "we" were "suspicious" of Santiago's purpose was not proper evidence against Gomez. See Fed.R.Evid. 602.

DEA Agent Raymond D'Alessio did testify that during one proffer session Perrone stated that he and Gomez had been informed that the purpose of the chemicals was to refine cocaine. Like other testimony concerning Perrone's proffer sessions it was introduced solely as to Perrone's credibility, with the jury instructed to consider it only for that limited purpose and not as substantive evidence of Gomez's guilt, and cannot be weighed in determining the sufficiency of evidence against Gomez. Because D'Alessio's testimony so forcefully implicated Gomez we note that despite the Court's admonition it is unlikely that the jury was able to comply with the Judge's instruction. See United States v. Colombo, 909 F.2d 711, 715 (2d Cir.199) (presumption of jury adherence to curative instructions "is dropped where there is an overwhelming probability that the jury will be unable to follow the court's instructions and the evidence is devastating to the defense") (citations omitted).

In sum, the only concrete evidence against Gomez was that he assisted in loading a van with materials whose nature he was not shown to have understood, and participated in transporting and unloading them. Such activity was consistent with his normal duties as an employee at Perrone's bodega. This court has held that where the acts of a defendant in a narcotics conspiracy case are minimal, there must be "independent evidence tending to prove that the defendant in question had some knowledge of the broader conspiracy." United States v. De Noia, 451 F.2d 979, 981 (2d Cir.1971). See also United States v. Nusraty, 867 F.2d 759, 763–64 (2d Cir. 1989) (simple act of meeting drug courier at airport, even in suspicious circumstances, insufficient basis to infer defendant's guilty knowledge). Here the government has not made such a showing, and the evidence was insufficient to permit a reasonable juror to conclude that either of the charges against Gomez had been proven beyond a reasonable doubt.

### B. Perrone

Perrone challenges his conviction on the grounds that expert testimony was improperly admitted against him, that statements he made during plea bargaining discussions with the United States Attorney's office were improperly admitted, and that the United States Attorney made fatally prejudicial remarks on summation.

#### 1. Expert Testimony

DEA Agent Kevin Mancini testified extensively as a fact witness about his observations in connection with Perrone's arrest and as an expert on the consistency of Perrone's behavior and other evidence with the characteristics of drug traffickers.

Fed.R.Evid. 702 permits expert testimony where it "will assist the trier of fact," a determination as to which the district court enjoys "broad discretion" and is to be sustained "unless manifestly erroneous." United States v. Simmons, 923 F.2d 934, 946 (2d Cir.), cert. denied, — U.S. —, 111 S.Ct. 2018, 114 L.Ed.2d 104 (1991). The testimony of agents as to the "clandes-

tine manner in which drugs are bought and sold" has been recognized as appropriate on the grounds that such information is likely to be beyond the knowledge of the average juror. *See United States v. Scop,* 846 F.2d 135, 141 (2d Cir.1988).

Agent Mancini testified that beepers, which were found at the arrest site, were commonly used by drug dealers. Judge Stanton instructed the jury that beepers are also put to legitimate uses and were not necessarily an indication of illegal activity. Agent Mancini also testified that other items found in the apartment into which Perrone and others unloaded the chemicals they had acquired were "tools of the narcotics trade." These included baggies, duct tape, a stun gun, a two-way radio, aluminum foil, a balance scale and knives. The agent discussed at length the use of such objects in the narcotics trade, but on cross examination acknowledged that there was no evidence in this case that the items he discussed had actually been used in connection with drug possession or distribution or other illegal activity.

Perrone argues that the agent's testimony was erroneously admitted because it did not "assist" the jury to determine any fact and because its probative value was clearly outweighed by its prejudicial impact. *See* Fed.R.Evid. 403. The government answers that the testimony was admissible to assist jurors who may not have known the typical methods of the narcotics trade. While we are concerned that expert testimony was permitted as to several questions (such as that guns are commonly used in the drug trade or that people wishing to avoid surveillance drive in a stop-and-start manner) seemingly within the grasp of any citizen, and may have achieved undue prominence in the minds of jurors because it was uttered by a so-called "expert," there is no indication that the testimony actually harmed Perrone, particularly in light of the fact that further questioning clearly indicated the limited relationship between Mancini's "expert" observations and the specific facts of the case.

Moreover, Judge Stanton did instruct the jury that testimony as to typical behavior and methods of narcotics traffickers did not preclude a finding that similar behavior by a defendant might nevertheless be consistent with innocent pursuits.

### 2. Use of Statements from Proffer Sessions

Perrone engaged in cooperation discussions with the United States Attorney's office with the understanding that statements he made could be used solely on cross-examination, should he testify, or to rebut evidence offered by or for him. At trial testimony as to the statements was admitted to attack Perrone's credibility. Judge Stanton instructed the jury at the close of trial that the statements could be considered by the jury solely as to credibility and could not be regarded as substantive evidence of his guilt:

You should first examine with great care whether each prior statement was made and whether, in fact, it was voluntarily and understandingly made.

If you find that those statements were made ... you must nevertheless use those statements in a very limited manner only.

[The statements cannot be used against Gomez.] [S]uch statements are not to be considered by you as affirmative evidence of Mr. Perrone's guilt. Evidence of the prior inconsistent statements was placed before you for the more limited purpose of helping you decide whether to believe Mr. Perrone's trial testimony....

That is the only use you may make of his statements to the DEA, if you find that they were made, and made voluntarily and understandingly.

Perrone argues that the admission of the statements was so prejudicial that Judge Stanton's instruction was ineffective to cure the damage created by the statements' "improper use."

At trial, Perrone testified in his own behalf that Apartment 51 was not used for drugs and that he only suspected but did not know about the plan to manufacture cocaine.

On cross-examination, the prosecution referred to prior statements Perrone alleg-

edly made during the proffer sessions, including statements that he knew that cocaine was to be manufactured from the chemicals, that drugs were expected to be received that night, and that it was intended to move the chemicals later to process the drugs elsewhere. The prosecution repeatedly asked Perrone if he had made such statements, and Perrone repeatedly denied that he had; Judge Stanton during the course of this questioning instructed the jury that the content of the prosecutor's questions was not evidence. Subsequently an agent testified as to his recollection of Perrone's statements during the proffer sessions.

As noted above, this court has held that the presumption of the effectiveness of curative instructions does not apply if "there is an overwhelming probability that the jury will be unable to follow the court's instructions" and the evidence is "devastating" to the defense. *United States v. Colombo,* 909 F.2d 711, 715 (2d Cir.1990). Perrone argues that such is the case here. *Colombo,* however, involved the admission of evidence that a sexual assault had occurred in connection with a robbery whose victim the defendant was convicted of facilitating, but in which he played no active role. *Id.* at 712. That evidence was deemed so inflammatory as to be inherently prejudicial and fatal to the conviction. *Id.* at 715.

■ While in *Colombo* the inflammatory evidence bore at most a tangential relation to the case against the defendant, in Perrone's case the evidence subject to the curative instruction was highly probative as to a central question in the case, namely Perrone's credibility as a witness. Given Perrone's inconsistent testimony and his earlier agreement that statements from plea discussions could be used to rebut such testimony, there is no merit to Perrone's argument that allowing such rebuttal use of his earlier statements was improper.

Perrone contends further that the use on cross examination of his offer during plea

discussions to introduce an undercover agent to a distributor who could provide DEA agents with three to four kilograms of cocaine was impermissible. After his counsel's objection to the question was denied, Perrone acknowledged making such an offer. Perrone argues that the question was objectionable because: 1) his statement was not inconsistent with his earlier testimony; 2) the prosecutor's question went beyond the scope of direct examination; 3) the answer was prejudicial; 4) the question was improper as an effort to prove action by reference to other wrongful acts.

The Government points out that Perrone failed to raise these objections at trial (though his counsel did make a general objection), and argues that he has waived them for appeal. *See United States v. Torres,* 901 F.2d 205, 227–28 (2d Cir.1990) (inexplicit objection insufficient to preserve objection for appeal absent plain error), *cert. denied,* —— U.S. ——, 111 S.Ct. 273, 112 L.Ed.2d 229 (1990). The Government further argues that a defendant's failure to request a limiting instruction waives his right to object to the absence of such an instruction on appeal. *United States v. Novod,* 923 F.2d 970, 977 (2d Cir.1991), *modified on other grounds following rehearing,* 927 F.2d 726 (2d Cir.1991), *cert. denied,* —— U.S. ——, 111 S.Ct. 2018, 114 L.Ed.2d 104 (1991).

■ Even if these procedural arguments are put aside, although they are meritorious, the government is correct that Perrone's offer to set up another cocaine deal in fact pertained to his testimony that he never had traded in or used drugs. While Perrone's offer did not flatly contradict his testimony on direct, it nevertheless was relevant to his credibility. Moreover, Perrone was free to argue, and indeed did, that his offer to set up a deal was solely an effort to win leniency by turning in some dealers whom he knew, but did not imply his own past drug dealing.[3]

---

**3.** In Perrone's summation, his counsel stated, "Don't think for a minute that this [evidence from the proffer sessions] is evidence of my

client's guilt. Because it's not. What it is is a life preserver for a man that may, at that time, have been drowning."

### 3. Admission of Evidence Seized from Apartment 51

■ Perrone argues that the District Court erroneously denied his motion to suppress evidence seized during the search of Apartment 51. As noted above, a protective search was conducted after agents had sought a warrant for the search, but before the warrant was obtained. A warrant was issued after the search based on the chemicals seen within the apartment during the warrantless protective search, on the registration of the van to a resident of Apartment 51, and on the utility company's listing of Perrone's bodega's telephone number as the customer contact number for Apartment 51.

The District Court held a suppression hearing, following which evidence obtained from the search nevertheless was admitted under the "independent source" doctrine. *See Nix v. Williams,* 467 U.S. 431, 443, 104 S.Ct. 2501, 2508, 81 L.Ed.2d 377 (1984); *Murray v. United States,* 487 U.S. 533, 537, 108 S.Ct. 2529, 2533, 101 L.Ed.2d 472 (1988) ("evidence initially discovered during, or as a consequence of, an unlawful search, but later obtained independently from activities untainted by the initial illegality" is admissible).

While the agents were unacceptably casual in conducting the initial search before they obtained a warrant,[4] we agree with the District Court's conclusion that the warrant would have been issued, and the contested evidence obtained, independent of the improper initial search of Apartment 51. As Judge Stanton observed, agents observed defendants acquire chemicals with no known commercial or laboratory use other than cocaine refining; they observed that the van used by defendants to transport the chemicals had no commercial markings and quickly learned it was registered at Apartment 51; they observed the chemicals being unloaded into the apartment's building; and they knew that cocaine often was refined using these chemicals in residential buildings. This information alone provides an adequate basis for the issuance of a warrant for Apartment 51. Accordingly evidence obtained from that apartment was properly admitted.

\*    \*    \*    \*    \*    \*

■ Finally, Perrone objects to the prosecution's comment in summation on his failure to call his attorney to support his testimony denying his alleged earlier statements during plea negotiations.[5] However, his objection at trial was sustained, and Judge Stanton immediately instructed the jury:

> Yes, I don't think that's a proper argument. That argument could equally be made by the defense as against the government attorney. The jury is directed to disregard it.

Perrone did not request additional curative instructions or move for a mistrial. Accordingly, his objection can only succeed on appeal if Judge Stanton committed "plain error." *See United States v. Dukes,* 727 F.2d 34, 40 (2d Cir.1984) (absent motion for mistrial, prosecutor's alleged prejudicial misconduct may be reviewed only for plain error). The prosecutor's comment, while ill-considered, was not so incendiary as to be irreparable, and was effectively defused not only by Judge Stanton's instruction that the jury disregard the comment, but by his immediate observation that the prosecution failed every bit as much as Perrone to present possible corroborative testimony. The immediate curative instruction

---

**4.** According to the principal agent testifying in the case, once the warrants were obtained the agents in fact did not read them because he "knew what we would be searching for." The agents also questioned Gomez's sister, who does not speak English, at her apartment on the first floor of the apartment building, and treated her confused nods in response to their requests as consent to a search. The resulting search of her apartment yielded nothing.

**5.** The prosecutor stated: "Now, no defendant ever has an obligation at all to call any witnesses at all. The burden always rests on the government. But Mr. Perrone did put on a witness, himself.

"But he also has the opportunity to call witnesses on his behalf. And at all those meetings in the United States Attorney's Office he had an attorney there. I suggest to you, ladies and gentlemen, that if that individual would have testified any differently than the agents, that would have happened."

was sufficient to prevent the offending comment from fatally tainting Perrone's conviction, though the prosecutor's comment was out of order.

Accordingly, Perrone's conviction under Count 2 is sustained. For reasons discussed below, his conviction is vacated as to Count 1, and the case remanded for resentencing.

## II.

Perrone was convicted on two counts. Count One charged him with participating in a conspiracy to manufacture, distribute and possess with intent to manufacture and distribute more than five kilograms of cocaine in violation of 21 U.S.C. §§ 802(35), 812, 841(a)(1), and 841(b)(1)(A), 841(d)(1), 841(d)(2) and 846. Count Two charged him with possessing the chemicals acetone and ethyl ether, knowing or having reasonable cause to believe that the chemicals would be used to manufacture cocaine in violation of 21 U.S.C. §§ 802(33), 802(35), 812, 841(a)(1), 841(d)(1), 841(d)(2) and 18 U.S.C. 2. He was sentenced to 140 months imprisonment on Count One and 120 months imprisonment on Count Two, to be served concurrently, plus a 5 year term of supervised release on Count One to be served concurrently with a 3 year term of supervised release on Count Two.

Perrone argues [6] that his sentence should be overturned on two grounds: 1) he should not have been convicted and sentenced under both § 841(d) and § 841(a); and 2) the sentencing guidelines were incorrectly applied to his case.

### A.  *Statutory Provisions*

■ In order to understand Perrone's objection to his sentence, it is necessary to examine the structure of penalties under 21 U.S.C. § 841. Perrone was convicted both of conspiracy to violate § 841(a) (intending to manufacture more than five kilograms of cocaine) and § 841(d) (possession of chemicals with intent to manufacture co-

caine and with knowledge or reason to believe they would be used to manufacture cocaine) as well as of a substantive violation of § 841(d).

§ 841(a) provides, in relevant part: "[I]t shall be unlawful for any person knowingly or intentionally ... to manufacture, distribute, or dispense, or possess with intent to manufacture, distribute or dispense, a controlled substance."

Under 21 U.S.C. § 841(b)(1)(A)(ii), violations of § 841(a) involving five kilograms or more of cocaine are subject to *a mandatory sentence of at least ten years.*

21 U.S.C. § 841(d) provides, in relevant part: "Any person who knowingly or intentionally (1) possesses a listed chemical with intent to manufacture a controlled substance except as authorized by this subchapter; [or] (2) possesses or distributes a listed chemical knowing, or having reasonable cause to believe, that the listed chemical will be used to manufacture a controlled substance ... shall be fined in accordance with Title 18, or imprisoned **not more than 10 years,** or both."  (emphasis added)

Under 21 U.S.C. § 846, "Any person who conspires to commit any offense defined in this subchapter shall be subject to the same penalties as those prescribed for the offense, the commission of which was the object of the attempt or conspiracy."

Perrone argues that § 841(a) is not properly applicable to his case. He points out that if possession of chemicals with intent to manufacture cocaine were sufficient to show a violation of 841(a), Congress would not have needed to amend § 841(d), as it did in March of 1989, to penalize that conduct. He also points out that the difference in penalties authorized for violations of the two sections (zero to ten years imprisonment for § 841(d) and ten years to life for § 841(a)) demonstrates that Congress viewed offenses based on possession of chemicals as significantly less culpable than offenses which are embraced within

---

**6.** In his brief, Perrone explicitly "joins in all arguments raised in Gomez's appeal as they may apply to him." Accordingly, although most of the principal sentencing points at issue here were argued in Gomez's brief and not in Perrone's, they are referred to as Perrone's arguments.

§ 841(a). Perrone argues that allowing his convictions under both § 841(a) and § 841(d) to stand would thwart the intent of Congress to subject possession of chemicals alone, even under circumstances evincing knowledge that the chemicals would be used to manufacture drugs, to the lower penalty.

With regard to Perrone's argument that Congress intended to limit punishment for offenses based on possession of chemicals, the government argues that Congressional intent is adequately carried out by the ten year maximum in § 841(d). The government concedes that a defendant convicted of one count of possessing sufficient chemicals with the intent to manufacture even 1000 kilograms of cocaine would face only a ten year maximum. Brief for the United States of America at 47. The government asserts, however, that the ten year maximum does not apply where the defendant is also convicted of "additional narcotics offenses." *Id.* at 48.

Here, however, the only narcotics offense involved was that charged under § 841(d) and § 846, namely, possession of chemicals with the intent to manufacture cocaine or knowledge that cocaine would be manufactured, and conspiracy to commit that offense. There was no other evidence of a conspiracy to manufacture cocaine involving Perrone than his possession of the chemicals under circumstances from which a jury could reasonably infer that he knew or should have known that they would be used to manufacture cocaine.[7] These are precisely the elements set forth by Congress in § 841(d) for which it has determined that a ten year maximum should apply.

Essentially, the government argues that the facts supporting a conviction for a conspiracy to violate § 841(d) will always be a sufficient basis to infer the existence of a conspiracy to violate § 841(a). We cannot accept that Congress would have intended § 841(a) and § 841(d) to be construed in a manner that a conviction of a conspiracy to violate § 841(d) with its ten year maximum would in every case automatically warrant a concomitant conviction of a conspiracy to violate § 841(a) with its ten year minimum.[8] We do not agree with the government's argument that Perrone's conviction of an "additional narcotics offense" transformed the ten year maximum into a minimum, for that begs the crucial question: whether there was additional evidence to support a conviction of the additional offense, in this case conspiracy to manufacture narcotics, beyond the minimum necessary to sustain a conviction under § 841(d). As far as this defendant was concerned, there was not.

▪ Therefore, where, as here, a defendant engages in no criminal conduct beyond that which is punishable by a maximum of ten years under § 841(d) and § 846, we hold that he or she cannot be convicted, *based only on that identical conduct,* of a violation of § 841(a). To permit a different result would be to vitiate Congress' explicit determination, as expressed in § 841(d), that the possession of processing chemicals warrants less severe punishment than do other more advanced efforts to traffic in narcotics. By not tying the penalty structure for possessing chemicals to particular amounts of drugs which might be produced with those chemicals, Congress implicitly recognized that it would be unfair to hold a defendant who merely possesses certain chemicals respon-

---

**7.** Indeed, Judge Stanton's summary of the evidence at sentencing indicates that both counts were based on the same facts:

> Here, Mr. Perrone was not prosecuted as being part of a large drug conspiracy. He was prosecuted for a rather narrow offense which gave rise to two criminal charges. One was a conspiracy to manufacture cocaine, and the other was the possession of materials to manufacture drugs.
>
> And his acts in support of those criminal purposes were to pick up and drive 20 gallons of ethyl ether and 32 gallons of acetone to

West 135th Street, where a search also revealed scales and bags and ammunition, stun guns, et cetera. And he had on his person a recipe for making cocaine.

**8.** There is every indication that it did not. § 846 provides that conspiracy to violate § 841(d) is subject to the same penalty as the substantive offense. It would violate this provision if a conspiracy to violate § 841(d) subjected a defendant to greater penalties than the substantive violation.

sible for all of the drugs which could theoretically have been produced using those chemicals.

Accordingly, Perrone's conviction under § 841(a) is vacated and the case is remanded for resentencing under § 841(d) in accordance with this opinion.

## B. *Application of the Guidelines*

Perrone asserts that the district court erred in sentencing him under § 2D1.1 of the sentencing guidelines and instead should have sentenced him under § 2D1.10.

■■ On appeal of a sentence imposed under the sentencing guidelines, the reviewing court must " 'accept the findings of fact of the district court unless they are clearly erroneous and shall give due deference to the district court's application of the guidelines to the facts.' 18 U.S.C. § 3742(e)." *United States v. Ibanez*, 924 F.2d 427, 429 (2d Cir.1991). Absent an abuse of discretion, the district court's application of the guidelines to the facts before it will not be overturned.

■■ The Sentencing Guidelines contain no section that specifically deals with the possession of chemicals alone. Appendix A to the sentencing guidelines "specifies the guideline section or sections ordinarily applicable to the statute of conviction." The Statutory Index in Appendix A specifies that § 2D1.1 is ordinarily applicable to violations of 21 U.S.C. § 841(d); that guideline was applied to this case. However, as the Court of Appeals for the Sixth Circuit observed in *United States v. Kingston*, 922 F.2d 1234, 1236 (6th Cir.1990), *cert. denied,*

— U.S. ——, 111 S.Ct. 2054, 114 L.Ed.2d 460 (1991),

> The crux of the problem is this: violators of § 841(d) have not sold or made any controlled substances, but § 2D1.1, which the Guidelines dictate should be followed in sentencing violators of § 841(d) ... fixes sentences based solely by the amount of controlled substance involved in the offense.

To get around this problem, the probation department calculated the guideline range applied to Perrone's case based on the jury's determination that the conspiracy in which Perrone participated involved more than five kilograms of cocaine. Perrone argues on appeal that he should not have been sentenced under § 2D1.1 because it was not possible for the court to make a reliable estimate of what quantity of drugs he should reasonably have foreseen were involved.

It is important to note that the scope of conduct for which a defendant can be held accountable under the sentencing guidelines is significantly narrower than the conduct embraced by the law of conspiracy. As we noted in *United States v. Lanza*, 790 F.2d 1015, 1023 (2d Cir.1986), *cert. denied*, 479 U.S. 861, 107 S.Ct. 211, 93 L.Ed.2d 141 (1986) to obtain a conviction for conspiracy, the government must demonstrate that the accused had some knowledge of the unlawful aims of the conspiracy, but it is not necessary to demonstrate that the accused knew *all* of the unlawful aims of the scheme charged. Under the guidelines, however, a defendant convicted of conspiracy can only be held accountable for what he could reasonably have foreseen.[9]

---

9. Section 1B1.3(a)(1) of the Sentencing Guidelines ("Relevant Conduct (Factors that Determine the Guideline Range)") provides that the base offense level shall be determined on the basis of

> all acts or omissions committed or aided and abetted by the defendant, or for which the defendant would be otherwise accountable, that occurred during the commission of the offense of conviction, in preparation for that offense, or in the course of attempting to avoid detection or responsibility for that offense, or that otherwise were in furtherance of that offense.

Application Note 1 to § 1B1.3 provides:

> In the case of criminal activity undertaken in concert with others, whether or not charged as a conspiracy, the conduct for which the defendant "would otherwise be accountable" also includes conduct of others in furtherance of the execution of the jointly-undertaken criminal activity **that was reasonably foreseeable by the defendant**.... Where it is established that the conduct was neither within the scope of the defendant's agreement, nor was reasonably foreseeable in connection with the criminal activity the defendant agreed to jointly undertake, such conduct is

Accordingly, in this case, Perrone could have been found guilty of participating in a conspiracy the ultimate object of which was to manufacture more than five kilograms of cocaine without necessarily knowing that manufacturing more than five kilograms was the object.[10]  However, under the guidelines, he can only be held responsible for what he knew or could reasonably have foreseen. *See e.g., United States v. Miranda–Ortiz*, 926 F.2d 172, 178 (2d Cir. 1991) (although defendant could be found guilty of conspiracy based on the entire amount of cocaine distributed, entire quantity of cocaine could not be used to establish base offense level without proof that he could reasonably have foreseen distribution of future amounts or reasonably should have known what past quantities were distributed); *United States v. Mickens*, 926 F.2d 1323, 1331–32 (2d Cir.1991) (attribution to defendant of full approximated amount of cocaine distributed by conspiracy was improper absent showing of foreseeability).

Neither the jury in rendering its verdict nor Judge Stanton in imposing sentence made a specific finding as to whether Perrone could reasonably have foreseen that the object of the conspiracy was to manufacture more than five kilograms of cocaine.  The determination of the appropriate offense level under the guidelines was based solely on the testimony of a chemist that the amount of chemicals seized might be used to process eight to ten kilograms of cocaine.  At the sentencing proceeding, Judge Stanton stated: "[T]he expert testified that close to ten kilos of cocaine could be manufactured with the amount of ethyl

ether and acetone which the defendant was very closely connected with."  However, he failed to make the necessary findings with regard to what Perrone actually knew or understood or reasonably could have foreseen with regard to the amount of drugs which those chemicals could have been used to process.  *United States v. Jacobo*, 934 F.2d 411, 416 (2d Cir.1991).

What might be considered hair-splitting in another context is simply due process where the consequences of factual determinations at sentencing are as substantial as they are under the present guidelines.  For example, if it were found that Perrone reasonably could have foreseen that 4.5 kilograms of cocaine might be produced by the conspiracy rather than 5 kilograms, his minimum sentence under the guidelines would be a little more than eight years rather than a little more than ten years.  If he reasonably could have foreseen 3 kilograms, his minimum sentence would be six and a half years.[11]  Accordingly, it is essential that district courts adhere strictly to the requirement under the guidelines that there be a finding that the amount of narcotics for which a defendant is to be held accountable was known or reasonably foreseeable by him or her.

The foreseeability requirement is consistent with the fact that the Sentencing Guidelines Commission adopted a "real offense" approach to drug trafficking.  As we explained in *United States v. Fernandez*, 877 F.2d 1138, 1142 (2d Cir.1989), the guidelines specify a number of different offense levels or benchmark sentences with

---

not included in establishing the defendant's offense level under the guidelines.  (emphasis added)

**10.** Judge Stanton charged the jury in this case: The key question therefore is whether each defendant joined the conspiracy with an awareness of at least some of the basic aims and purposes of the unlawful agreement.... I instruct you that to become a member of a conspiracy each defendant need not have known the identities of each and every other member, nor need he have been apprised of their activities or all of their activities.... What is necessary is that each defendant must have participated with knowledge of at

least some of the purposes or objectives of the conspiracy, and with the intention of aiding in the accomplishment of those unlawful acts.

**11.** The Drug Quantity Table at § 2D1.1(c) of the sentencing guidelines specifies the following sentencing ranges for an offender like Perrone who falls within Criminal History Category I:

| AMOUNT OF COCAINE | BASE OFFENSE LEVEL | GUIDELINES RANGE |
| --- | --- | --- |
| 5–15 kilograms | 32 | 121–151 months |
| 3.5–5 kilograms | 30 | 97–121 months |
| 2–3.5 kilograms | 28 | 78–97 months |
| .5–2 kilograms | 26 | 63–78 months. |

higher offense levels for more serious crimes.

> As the Commission has pointed out, this "real offense" approach keys the sentence to the real harm posed by the offense, and, by disassociating the sentence from the offenses actually charged, takes away from the charging prosecutor much of the power to determine the ultimate sentence. *See Guidelines Manual, supra,* at 1.5–1.6. *Id.*

The "real offense" here is possession of chemicals with intent to manufacture cocaine or with knowledge or reasonable cause to believe that the chemicals might be used to manufacture cocaine, an offense which is penalized under § 841(d) and § 846 without regard to the amount of chemicals or potential drugs involved. There was insufficient evidence that Perrone could have reasonably foreseen that at least five kilograms of cocaine could have been manufactured from the materials in his possession. The cocaine "recipe" which specified the amount of chemicals that were obtained by Perrone and his codefendants was not written in Perrone's handwriting and there is no evidence that Perrone himself had any knowledge of how much cocaine might have been processed with the chemicals.[12] The government relies merely on the volume of chemicals involved to prove that Perrone knew how much cocaine might be made. However, the government in this case had to call an expert so that the jury and judge could learn how much cocaine could be processed with the chemicals seized. There was no credible evidence that Perrone was any more knowledgeable than the average juror about the specifics of drug chemistry.[13] Indeed, if he had been more knowledgeable, it probably would not have been necessary for the person he was working for to supply him with such a detailed list.

This case is readily distinguishable from *United States v. Macklin,* 927 F.2d 1272 (2d Cir.1991), cited by the government to support the proposition that it was appropriate to determine drug quantity for sentencing purposes based upon the amount that could be produced with the chemicals seized. In *Macklin,* the defendant possessed all the chemicals necessary for manufacturing the amount of PCP for which he was sentenced. Here, by contrast, Perrone could not have manufactured any drugs with the chemicals which were seized from him because he did not possess any cocaine base. This court has never held that one who possesses only some of the chemicals required to manufacture a drug can be sentenced on the basis of the total amount of drugs that might have been manufactured had he or she possessed all of the necessary chemicals, and we decline to do so here.

The sentencing guidelines are structured to impose sentences in narcotics cases on the basis of the amount of narcotics involved. The recent "war on drugs" has produced a spate of prosecutions for narcotics offenses where no actual drugs have been seized. In such cases, the court must attempt, on the base of the available evidence, to estimate what quantity of drugs was involved.[14] In a number of cases, it is

---

12. Indeed, Perrone testified at trial that he and his codefendants were to receive only a "couple of hundred dollars," which would not necessarily have led him to believe that he was participating in an operation of the size claimed by the government.

13. The government makes much of the fact that, in the course of his attempt to cooperate with them, Perrone offered to introduce the agents to someone who would sell them a few kilograms of cocaine. "It defies belief," declares the government in its brief, "to believe that Perrone had nothing to do with drugs but a multi-kilogram cocaine dealer would trust him to introduce a purchaser for multi-kilogram quantities of cocaine." However, no such transaction was

ever consummated and Perrone might well have been bluffing about his connections in order earn the good will of the agents, or might simply have been mistaken about his ability to arrange such a deal.

14. Application Note 2 to Section 2D1.4 provides: Where there is no drug seizure or the amount seized does not reflect the scale of the offense, the sentencing judge shall approximate the quantity of controlled substance. In making this determination, the judge may consider, for example, the price generally obtained for the controlled substance, financial or other records, similar transactions in controlled substances by the defendant, and the size or capability of any laboratory involved.

possible to reach a reliable estimate on the basis of evidence such as testimony as to conversations between the defendant and drug customers (*United States v. Cousineau,* 929 F.2d 64 (2d Cir.1991) (determination of quantity based on testimony of witnesses as to actual purchases from defendant) or between defendants and government agents (*United States v. Vazzano,* 906 F.2d 879 (2d Cir.1990) (quantity based on amount of cocaine defendant told informant he had sold and amount he told informant he possessed); *United States v. Adames,* 901 F.2d 11 (2d Cir.1990) (quantity based on sale defendant negotiated with agents); *United States v. Candito,* 892 F.2d 182 (2d Cir.1989) (same)), or records of past narcotics transactions or, as in *Macklin,* chemicals which need only be combined with each other to constitute usable drugs.

There are some cases, however, in which it is simply not possible for the court to make a reliable estimate of the amount of drugs involved. This is such a case. There is no evidence here of any conversations about the amount of drugs that were going to be manufactured or sold, no records of past sales, no money. The chemicals that were seized are cleansing agents used to process cocaine base into cocaine hydrochloride. However, no cocaine base or hydrochloric acid were seized and without those two ingredients, no drugs could be manufactured.

In ruling that the evidence as to quantity was insufficient in this case, we are not holding that a court can never reach a reliable estimate as to quantity on the basis of some drug ingredients if other ingredients are missing. If the missing ingredients are demonstrated to be readily available to the defendant, the absence of those ingredients might not prevent a court from determining the amount of drugs that probably could have been produced. However, where, as here, the missing ingredients are

costly and somewhat difficult to obtain, it is unduly speculative to hypothesize as to how much cocaine would have been produced had the defendant actually obtained any drugs. Such speculation violates the commitment to due process where, as here, differences in quantity can have enormous impact on the sentence to be imposed under the guidelines. Accordingly, Perrone should be sentenced on the basis of the chemicals he actually possessed rather than on the basis of the cocaine he might have manufactured had he obtained the other essential raw materials.

■ The introduction to Appendix A to the guidelines provides that "If, in an atypical case, the guideline section indicated for the statute of conviction is inappropriate because of the particular conduct involved, use the guideline section most applicable to the nature of the offense conduct charged in the count of which the defendant was convicted." Where it is not possible to estimate drug quantity reliably, § 2D1.1 is not the appropriate guideline section.[15] Moreover, application of the offense levels listed in the Drug Quantity Table at § 2D1.1 to cases of possession of acetone and ether in any significant amount will result in sentences that often exceed the § 841(d) statutory maximum, a further indication that at least in this case, it is not the appropriate guideline for that statute.

■ Perrone postulates that the appropriate guideline provision is § 2D1.10, the guideline applicable to violations of 21 U.S.C. § 858 ("Endangering Human Life While Illegally Manufacturing a Controlled Substance"). Perrone asserts that § 2D1.10 is the only guideline that comes close to measuring the conduct embraced by a violation of § 841(d) without exceeding the statutory maximum.

§ 2D1.10 prescribes a base offense level of the greater of "3 plus the offense level

---

**15.** We decline to adopt the reasoning followed by the Court of Appeals for the Sixth Circuit in *United States v. Kingston,* 922 F.2d 1234 (6th Cir.1990) which held that § 2D1.1 was properly applied to a conviction under § 841(d) in that case. The *Kingston* court observed, "As Congress intended to punish severely the possessors of listed chemicals with the intent to manufacture controlled substances, having provided a maximum of ten years imprisonment for violators, courts should interpret these provisions to arrive at a fair method of assessing meaningful punishment." 922 F.2d at 1236. Because, as we explain above, the clear intent of Congress was to punish violators of § 841(d) less severely than violators of other provisions, we cannot endorse the application of § 2D1.1 to such cases.

from the Drug Quantity Table in 2D1.1" or "20." Perrone argues persuasively that the alternative of level 20 should be applied to cases like one where no controlled substance was seized or shown to be readily accessible. The corresponding sentencing range for Perrone as a first offender is 33–41 months. Where, as here, there is no one guideline that is perfectly applicable to the real offense behavior, the court must choose the most appropriate guideline under the circumstances. We choose § 2D1.10 because it governs behavior similar to the actual offense conduct here, it is possible to apply it without reference to drug quantity, and application of it produces sentences within the range intended by Congress when it imposed a ten year maximum for violations of § 841(d).

### CONCLUSION

Perrone's conviction as to Count 2 is affirmed. His conviction as to Count 1 is vacated and the case is remanded so that Perrone may be resentenced under § 2D1.10, using 20 as the base offense level, as explained above. The conviction of Gomez is reversed as supported by insufficient evidence.

LUMBARD, Circuit Judge, concurring in part and dissenting in part:

I concur in the affirmance of Perrone's convictions and in the remand to the district court for resentencing.

I dissent from the reversal of Gomez's convictions. Based on the proof before the jury, as is fully set forth in the majority opinion, I believe there was sufficient evidence to support Gomez's convictions. We must remember that the jury heard the witnesses' testimony and listened to defense counsel's attempt to explain the part Gomez played in the offense. Obviously, the jury was not persuaded; it did not believe that Gomez had no guilty knowledge of what was being done. This verdict is supported by the evidence.