**UNITED STATES COURT OF APPEALS**
**For the Fifth Circuit**

No. 99-20462

UNITED STATES OF AMERICA,

Plaintiff - Appellee,

VERSUS

JOSE SANTIAGO MINOTTA-GONZALEZ, aka Hector Luis Gomes-Martinez, aka Jose Santiago Minotta, aka Jose Santiago Minota-Gonzalez, aka Jose Santiago Minota, aka Jose Santiago Minotao-Gonzalez, aka Jose Santiago Minotao, aka Hector Luis Gomez, aka Hector Luis Gomez-Martinez, aka Hector Luis Gomes, aka Casa Grande,

Defendant - Appellant.

Appeal from the United States District Court
For the Southern District of Texas, Houston Division
(98-CR-397-1)

August 22, 2000

Before POLITZ, EMILIO M. GARZA, and DENNIS, Circuit Judges.

PER CURIAM:[*]

Jose Santiago Minotta-Gonzalez (Jose) appeals the judgment of conviction and sentence entered by the district court pursuant to a guilty plea on the charge of unlawful possession of a firearm by

---

[*]Pursuant to 5ᵀᴴ CIR. R. 47.5, the Court has determined that this opinion should not be published and is not precedent except under the limited circumstances set forth in 5ᵀᴴ CIR. R. 47.5.4.

1

an illegal alien in violation of 18 U.S.C. § 922(g)(5). Jose contends that the sentence of 120 months of incarceration to be followed by three years of supervised release and a fine of $1,000 constituted a misapplication of the federal sentencing guidelines, U.S.S.G. § 2K2.1, and that his guilty plea was involuntary. We affirm for the following reasons.

## I. Facts and Procedural History

The drug enforcement squad of the Federal Bureau of Investigation (FBI) began surveillance of an apartment on Ella Boulevard in Houston, Texas, in August 1998 on suspicion that three members of the Minotta family from Buena Ventura, Colombia, were trafficking in narcotics: Jose, Narciso Montano-Minotta (Narciso), and Aldomar Anguilo-Gonzalez (Aldomar). On August 30, 1998, the surveillance team followed a vehicle driven by Narciso from the Ella Boulevard apartment to an apartment on Place Rebecca Lane. En route Narciso proceeded along a circuitous route, stopped at The Gables at Champions apartment complex for about 30 minutes, and when he resumed the trek he apparently sought to determine whether he was being followed. Narciso stayed at the Place Rebecca Lane apartment for approximately an hour and a half and then returned to the same building he had previously visited at The Gables at Champions.

Assisted by the Harris County Hot Spots Narcotics Enforcement Team, the FBI agents sought to search the Place Rebecca Lane apartment. Jose opened the apartment door, identified himself as

2

"Hector Luis Gomez," and gave written consent to the search under that alias. The agents discovered and seized $393,078 in United States currency that Jose attributed to his friend "Carlos," and canines alerted to the cash for the presence of narcotics. The agents also seized a loaded .357 magnum Ruger revolver on a bed in an upstairs bedroom. Jose claimed that an undisclosed friend had given him the gun. The search also resulted in the seizure of a piece of paper with a pager number and the letters "Bi" written next to the number, which was a pager number for Narciso under his alias of "Bigote."

Subsequently the same day, Aldomar orally consented to a search of the Ella Boulevard apartment wherein the FBI agents, assisted by both the Harris County Narcotics Enforcement Team and the Drug Enforcement Administration (DEA), discovered, inter alia, 120 kilograms of cocaine in a bedroom closet, a drug ledger, $10,000 in cash, and another .357 magnum revolver -- this one a Smith & Wesson. The search also revealed photographs of Aldomar and Narciso together, as well as a business card with Narciso's pager number. Several compact disks were seized on which the name "Bigote," Narciso's alias, had been written on the cover. Aldomar had leased the apartment under the alias "Carlos Ramon Fernandez," and the apartment was only accessible through the attached garage.

The surveillance team following Narciso, upon being informed of the fruits of the search of the Ella Boulevard apartment, and while that search was still ongoing, effected a traffic stop of

3

Narciso. He consented to a search of both his vehicle and The Gables at Champion apartment. In the vehicle, at Narciso's direction, agents recovered yet another .357 magnum revolver in the glove box; this handgun was the same make and model (Ruger SP101) as the revolver seized earlier from Jose's apartment. Also in the vehicle was a garage door opener to the Place Rebecca Lane apartment wherein the $393,078 in cash had been seized. Finally, a grocery bag containing a money wrapper with a $250 denomination on it and small rubber bands was recovered during the search of the vehicle. The money wrapper and rubber bands were consistent with those used to wrap both the $393,078 in cash seized from the Place Rebecca Lane apartment and the $10,000 in cash seized from the Ella Boulevard apartment.

Jose had previously been convicted on a guilty plea entered under the alias "Nicolas Lopez" on April 8, 1988, in the District Court of Oklahoma County for possession of a controlled substance (cocaine) with intent to distribute. Jose was deported on June 1, 1988. In an interview with an agent for the Immigration and Naturalization Service (INS) conducted after the instant arrest, Jose related that he was from Buena Ventura, Colombia, and had re-entered the United States illegally by ship in Miami.

On September 23, 1998, Jose was indicted on one count of unlawful possession of a firearm by an alien unlawfully and illegally in the United States in violation of 18 U.S.C. § 922(g)(5). Jose initially pled not guilty on October 1, but he

entered a guilty plea on November 24, 1998, at his rearraignment. He did so after offering sworn statements that he was satisfied with the performance of his attorney, that he was aware of his right to persist in the plea of not guilty and proceed to trial before a jury, and that the plea change had not resulted from force, threats, or inducements. After summarizing the elements of the charged offense[2] and satisfying itself that Jose understood them, the district court informed him that the maximum sentence was ten years of imprisonment and/or a $250,000 fine to be followed by three years of supervised release. Jose indicated that he understood these consequences, and he reaffirmed his intent to plead guilty. The district court noted that there was no plea agreement and that Jose would not be able to withdraw the guilty plea. Jose again reaffirmed his desire to plead guilty to the charged offense after agreeing to the government's factual basis therefore. The district court then accepted the guilty plea, found Jose guilty, and ordered the preparation of a presentence report (PSR).

In assessing Jose's base offense level, the PSR noted that U.S.S.G. § 2K2.1 is the applicable guideline for a violation of 18 U.S.C. § 922(g)(5), and that § 2K2.1 cross-references § 2X1.1 for cases such as this one where the defendant illegally possessed a

_____

[2]That Jose (1) was an alien, (2) was illegally in the United States, and (3) was in possession of a firearm or ammunition that had been transported in interstate commerce.

5

firearm in connection with the commission or attempted commission of another offense. In turn, § 2X1.1 directed the court to apply the sentencing guideline applicable to that other offense, in this case conspiracy to possess with intent to distribute cocaine. Because Jose was being held accountable for 180 kilograms of cocaine, the PSR, citing § 2D1.1(c)(1), indicated a base offense level of 38. It then recommended an upward adjustment of four levels (two levels for possession of a firearm during the commission of the offense, § 2D1.1(b)(1), and two levels for Jose's role in the offense, § 3B1.1), and a downward adjustment of three levels for acceptance of responsibility pursuant to § 3E1.1(a) and (b) for a total offense level of 39. No criminal history points were assessed for Jose's prior conviction.

Jose filed an objection to the PSR on March 16, 1999, complaining (1) that his offense level should not be adjusted pursuant to the cross reference under § 2D1.1 because the PSR failed to establish the greater offense -- that he possessed the firearm in connection with a conspiracy to possess with intent to distribute cocaine, and because the information relied upon in the PSR lacked sufficient indicia of reliability to support its probable accuracy as reflected by the fact that the defendant was not charged with the greater offense; (2) that the two level enhancement for his managerial role in the conspiracy was unsupported by the PSR; and (3) that the two level enhancement for possession of a firearm constituted double counting and was

6

improper.  Instead, he argued that his offense level should have been 14.  On April 26, 1999, the district court overruled the objection, adopted the PSR recommendations, noted that the guideline range of 262 to 327 months exceeded the statutory maximum sentence of ten years, and sentenced Jose to a 120-month term of imprisonment to be followed by a three-year term of supervised release.  Jose was also ordered to pay a $1000 fine and a $100 mandatory assessment.  Jose timely filed a notice of appeal.

## II. Analysis

On appeal Jose argues essentially that since he possessed the firearm in the Place Rebecca Lane apartment containing only the $393,078 in cash and no drugs, there was insufficient evidence of drug activity at that apartment to link the gun to a drug conspiracy such that § 2K2.1(c) is inapplicable.  Similarly, Jose argues that because he was unaware of the potential application of § 2K2.1(c) at the time of his guilty plea and unaware that he would receive the maximum sentence, his guilty plea was involuntary.

1.  Application of U.S.S.G. 2K2.1

We review the application of the Sentencing Guidelines de novo, and we review the sentencing court's findings of fact for clear error.  See United States v. Edwards, 65 F.3d 430, 432 (5th Cir. 1995).  "'A factual finding is not clearly erroneous as long as the finding is plausible in the light of the record as a whole.'"  Id. (citing and quoting United States v. Brown, 7 F.3d 1155, 1159 (5th Cir. 1993)).  We "accord great deference to the

7

trial judge's application of the sentencing guidelines." United States v. Condren, 18 F.3d 1190, 1193 (5th Cir. 1994) (citations and internal quotation marks omitted).  We will uphold the sentence unless it was imposed in violation of the law, resulted from an incorrect application of the guidelines, or was an unreasonable departure from the applicable guideline range.  See United States v. Vital, 68 F.3d 114, 117 (5th Cir. 1995).

Jose challenges the U.S.S.G. § 2K2.1(c) enhancement:

(1) If the defendant used or possessed any firearm or ammunition in connection with the commission or attempted commission of another offense, or possessed or transferred a firearm or ammunition with knowledge or intent that it would be used or possessed in connection with another offense, apply –

(A) §2X1.1 (Attempt, Solicitation, or Conspiracy) in respect to that other offense, if the resulting offense level is greater than that determined above. . . .

U.S.S.G. § 2K2.1 (c)(1)(A).  By application of the cross referenced provision, § 2X1.1,[3] Jose's base offense level was calculated at 38

_____

[3]Section 2X1.1 provides:
(a) Base Offense Level: The base offense level from the guideline for the substantive offense, plus any adjustments from such guideline for any intended offense conduct that can be established with reasonable certainty.
(b) Specific Offense Characteristics
. . . .
(2) If a conspiracy, decrease by 3 levels, unless the defendant or a co-conspirator completed all the acts the conspirators believed necessary on their part for the successful completion of the substantive offense or the circumstances demonstrate that the conspirators were about to complete all such acts but for apprehension or

8

because he had possessed the firearm in connection with a conspiracy to possess with the intent to distribute 180 kilograms of cocaine.[4]  After adjustments, the total offense level was 39.

By adopting the PSR, the district court adopted the finding that Jose possessed the firearm "in connection with the commission" of conspiracy to possess with intent to distribute 180 kilograms of cocaine.  Jose argues that the district court's findings of fact in this regard were clearly erroneous such that it incorrectly applied the § 2X1.1 enhancement.[5]  Specifically, he contends that the seizure of the $393,078 in cash from the apartment was insufficient to link the gun, also seized from the apartment, to a drug conspiracy.

"In determining the relevant facts at sentencing, the district court is not restricted to information that would be admissible at trial.  The district court may consider any information which has 'sufficient indicia of reliability to support its probable accuracy.'" Vital, 68 F.3d at 120 (citing and quoting U.S.S.G. §

_____

interruption by some similar event beyond their control. U.S.S.G. § 2X1.1.

[4]The base offense level for the substantive offense, possession with intent to distribute cocaine, was prescribed by § 2D1.1(c)'s drug quantity table: "Level 38 . . . 150 KG or more of Cocaine (or the equivalent amount of other Schedule I or II Stimulants." U.S.S.G. § 2D1.1(c)(1).

[5]Jose does not argue alternatively that, even if the evidence was sufficient to support the finding that he conspired to possess with intent to distribute cocaine, the evidence does not support a finding that the quantity of cocaine attributed to the conspiracy was 180 kilograms.

6A1.3, comment, and <u>United States v. Manthei</u>, 913 F.2d 1130, 1138 (5th Cir. 1990)). The PSR is considered reliable and may be regarded as evidence by the trial judge in making sentencing determinations. <u>See</u> <u>id</u>. Even though Jose objected to the PSR's conclusions as unsupported by sufficient reliable evidence, he did not submit affidavits or other reliable evidence to rebut the information in the PSR, and thus the district court was able to adopt its findings without further inquiry or explanation.[6] <u>See</u> <u>id</u>. (citing <u>United States v. Mir</u>, 919 F.2d 940, 943 (5th Cir. 1990)). "Consequently, the district court's reliance on the PSR was not clearly erroneous." <u>Id</u>. Because, like the PSR, the district court relied on and applied only the first of § 2K2.1(c)(1)'s two alternatives "in connection with standards," our charge is to review the discrete findings contained in the PSR to determine whether the district court clearly erred in finding, by a preponderance of the evidence, that the .357 magnum handgun found on the bed in the apartment was possessed by Jose in connection

_____

[6]A district court may rely on its adoption of the PSR to satisfy Federal Rule of Criminal Procedure 32(c)(1)'s requirement that for each matter controverted at the sentencing hearing the court either make a finding on the allegation or a determination that no finding is necessary because the controverted matter will not be taken into account or otherwise affect the sentencing. <u>See</u> <u>United States v. Huerta</u>, 182 F.3d 361, 364 (5th Cir. 1999). Moreover, "[w]e have also held: 'Although a district court must resolve disputed issues of fact if it intends to use those facts as a basis for sentencing, the court can adopt facts contained in a PSR without inquiry, if those facts ha[ve] an adequate evidentiary basis and the defendant does not present rebuttal evidence.'" <u>Id</u>. (citing and quoting <u>United States v. Puig-Infante</u>, 19 F.3d 929, 943 (5th Cir. 1994)).

with the commission of a conspiracy to possess with intent to distribute 180 kilograms of cocaine.[7]

In <u>United States v. Mitchell</u>, we held that § 2K2.1(c)(1) requires a "functional nexus" between the gun and the other offense as there is no "ipso facto nexus rule between firearms and illicit drugs every time a defendant who is convicted of the abuse of one has some relationship with the other, no matter how attenuated." 166 F.3d at 756. In applying the "functional nexus" requirement to the facts of that case, we then concluded that:

> [T]he constructive possession of the gun under the car seat by virtue of Mitchell's driving the car while he was taking the three children to school, was too geographically, spatially, functionally, and logically remote from his possession of crack cocaine (which, for purposes of relevant conduct -- *not* conviction -- Mitchell constructively possessed by virtue of those drugs being located in the locked box inside the house where he and his girlfriend were residing) to satisfy the requirement of a cognizable linkage between possession of the gun and "commission or attempted commission of another offense." Cumulatively, the two are simply too attenuated to permit nexus! Specifically, the mere coincidence of keys to the locked box and to the car on Mitchell's key ring is too minimal to bridge the attenuated nexus gap, particularly when viewed in light

---

[7]Binding precedent in this circuit requires that we treat the district court's determination of the relationship between the firearm and the drug conspiracy as a factual finding to be reviewed for clear error. <u>See</u> <u>United States v. Mitchell</u>, 166 F.3d 748, 754 n.24 (5th Cir. 1999) (citing <u>Condren</u>, 18 F.3d at 1199-2000).

11

of the presence of an intervening firearm, owned by Mitchell, in much closer proximity to the drugs than was the gun of conviction. In essence, under the particular facts of this case, the chasm of nexus between the gun and the drugs requires a leap of legal logic too great to make the required connection. We are constrained to conclude that the sentencing court's finding of the required connection was clearly erroneous.

Id. (emphasis in original).

In an effort to demonstrate a similar chasm between his possession of the .357 magnum and the drug conspiracy, Jose argues the evidence established only that (1) Jose resided in the Place Rebecca Lane apartment; (2) a .357 magnum handgun was seized from a third-floor bedroom of that apartment -- a common location for a gun used for personal protection; (3) $393,078 in cash was also seized from that apartment; and (4) the stash house used in the conspiracy was the Ella Boulevard Apartment where Aldomar was guarding the 119.1 kilograms of cocaine and $10,000 in cash. Accordingly, Jose contends that there was no reliable evidence tying the cash seized from Jose's apartment to the drugs seized from Aldomar's apartment, and, therefore, there was insufficient evidence connecting the firearm seized from Jose's apartment to the drugs. Furthermore, Jose argues that, had there been sufficient evidence that he engaged in a drug trafficking conspiracy, he would have been charged and indicted for that crime rather than for the lesser offense of illegally possessing a firearm by an alien.

The PSR stated that Jose is Narciso's uncle, and Narciso is

12

Aldomar's cousin.  It further recounted that Jose oversaw the distribution of cocaine received from Colombia, and it described the events of August 30, 1998, as set forth above.  The PSR also stated that the drug ledger recovered from the Ella Boulevard apartment indicated that the apartment was used as a stash house by Jose, Narciso, and Aldomar, and that the original shipment of cocaine weighed approximately 180 kilograms.  Of this shipment, just over 119 kilograms of cocaine were seized from the Ella Boulevard apartment guarded by Aldomar, and the remainder, approximately 60 kilograms, had apparently been converted into the $393,078 in cash seized from the Rebecca Lane apartment occupied by Jose.  This cash was found in different rooms throughout the apartment (bedroom, bathroom, and kitchen) and was wrapped in a manner identical to the cash seized from the Ella Boulevard apartment.  Jose offered no explanation for the money except that it was given to him for keeping by a friend named "Carlos," and Jose stated he did not know his friend's last name.  Jose stated that he was employed at an auto body shop and earned $230 per week.

The PSR further recounted that on August 30, 1998, the same day all other searches and seizures were conducted, the FBI also seized a vehicle parked at the Ella Boulevard apartment.  This car was registered to Jose's girlfriend, Taily Montoya, who told the FBI that it was utilized exclusively by Jose.  Also seized from that apartment were cellular telephone records showing a call to a number subscribed to by Jose's alias, "Hector Luis Gomez."

13

The PSR noted that the search of Narciso's vehicle revealed a garage door opener that opened the garage at Jose's Place Rebecca Lane apartment, thereby affording Narciso ready access to the apartment from which the $393,078 was seized. Surveillance by the FBI revealed that on the day of the seizures, Narciso had traveled by vehicle from the Ella Boulevard apartment where the 119.1 kilograms of cocaine were stored and went to Jose's Place Rebecca Lane apartment. Additional investigation by the Bureau of Alcohol, Tobacco, and Firearms (ATF) discovered that the .357 magnum Ruger revolvers seized from Jose and Narciso had both been stolen from a warehouse in Houston.

The PSR also contained information from debriefing reports compiled by the FBI and DEA and from direct interviews with the FBI Special Agent. Independent debriefings of confidential informants indicated that Aldomar and Narciso were receiving cocaine from Jose's brother, Clodomiro Minotta, in Colombia, and that Jose was trafficking in drugs in the Houston area by directing the activities of Aldomar (guard) and Narciso (runner). Aldomar, in an interview conducted by a probation officer, stated that Jose and Narciso asked him to "take care of the cocaine" in the Ella Boulevard apartment for a period of not more than three days in return for $20,000.

In light of the record as a whole, we conclude that the district court did not clearly err in finding, by a preponderance of the evidence, as a matter of fact that Jose possessed the .357

14

magnum in connection with the conspiracy to possess with intent to distribute 180 kilograms of cocaine. The discrete findings of fact as reflected by the PSR in this case establish the "functional nexus" required by § 2K2.1(c) between possession of the firearm and the commission of the other offense. See Mitchell, 166 F.3d at 756. There is no chasm indicating that the trial court's finding of the required connection was clearly erroneous because Jose possessed the firearm in a manner not at all geographically, spatially, functionally, or logically remote from the relevant conduct that was at least established by a preponderance of the evidence, i.e. commission of conspiracy to possess with intent to distribute cocaine. Accordingly, we conclude that the offense level enhancement contained in § 2K2.1(c)(1)(A) was not misapplied.

2. Voluntariness of Guilty Plea

Jose's claim that the guilty plea was involuntary is based on a claim that the district court's misstatements of the law erroneously induced Jose to refrain from offering evidence at the sentencing hearing in support of his objections to the PSR's findings.

We review the voluntariness of a guilty plea de novo. See United States v. Amaya, 111 F.3d 386, 388 (5th Cir. 1997) (citing United States v. Howard, 991 F.2d 195, 199 (5th Cir. 1993)). The only federal requirement is that a plea be entered knowingly and voluntarily. Howard, 991 F.2d at 199 (citing Boykin v. Alabama, 395 U.S. 238, 242 (1969)). The strictures of due process require,

15

therefore, that the defendant be advised of and understand the consequences of the plea. See United States v. Pearson, 910 F.2d 221, 223 (5th Cir. 1990) (citing Barbee v. Ruth, 678 F.2d 634 (5th Cir. 1982), cert. denied, 459 U.S. 867 (1982)). "A plea is involuntary, and thus insufficient to support a conviction, if the defendant 'has such an incomplete understanding of the charge that his plea cannot stand as an intelligent admission of guilt.'" Taylor v. Whitley, 933 F.2d 325, 329 (5th Cir. 1991) (citing and quoting Henderson v. Morgan, 426 U.S. 637, 645 n.13 (1976)).

At the sentencing hearing the district court asked Jose if he disputed the facts as related in the PSR or had anything to add, especially concerning Jose's association with, and the activities of, Aldomar. Jose responded, "I don't understand." The sentencing court then rephrased the question:

> All right. Well, let me approach it this way. Your attorney has filed some objections to the report. Part of what he objects to is the fact that they didn't charge you with the drug offense that could have gotten you 300 months. And he says as a legal matter that the reason the government didn't proceed with the drug charge is because it was a weak charge. True or not true, I'm not really concerned about it. It has nothing to do with the gun charge, does it?

Jose then responded, "Yes. That's right." He was then asked whether the objections to the PSR signaled a desire to change the guilty plea. Jose answered, "No, no. I'm not changing my opinion. I'm not changing the plea that I made."

16

The district court then overruled the defendant's objections to the PSR.  Jose, asked if he had any other objections or corrections, responded: "What I want to ask you is if they are judging my behavior regarding the arm possession and not the drugs."  The district court replied:

> The behavior that you would be punished for would be the weapons charge because if you were being punished for the drug charge, you would be in prison basically for the rest of your life, assuming that the maximum punishment were given by the court.
>
> You are not charged with the drug offense, although you have to recognize that the drug offense or the offenses that are alleged to be drug offenses are related to the gun charge.  They are related and connected maybe I should say.  But they do not in a real sense increase your punishment.  Do you understand that?

Jose answered, "Yes, I understand."

The district court then adopted the PSR and sentenced Jose to the statutory maximum term of imprisonment.  Jose then stated, "I want to ask the judge why if I pled guilty with a sentence from one to ten years, why am I getting the maximum of ten years."

The district court responded:

> You are getting the maximum of ten years because as I look at the statute and the crimes that you were involved in, alleged to have been involved in by the government, which I have now found to be your involvements . . . not by a reasonable doubt standard, but by a different standard that permits me to look at your conduct and determine what the appropriate sentence

17

ought to be.

Jose argues that the district court's statements, on the whole, were misstatements of law that effectively dissuaded him from contesting the facts in the PSR since he had been led to believe that he was being judged only by the firearms charge and that the uncharged drug offense would not increase his punishment "in a real sense." He claims that this confusion renders the guilty plea itself involuntary.

As we held in United States v. Pearson, "'[t]he consequences of a guilty plea, with respect to sentencing, mean only that the defendant must know the maximum prison term and fine for the offense charged. As long as [the defendant] understood the length of the time he might possibly receive, he was fully aware of his plea's consequences.'" 910 F.2d at 223 (citing and quoting United States v. Rivera, 898 F.2d 442, 447 (5th Cir. 1990) (in turn quoting Barbee, 678 F.2d at 635)).[8] "The court informed [Jose] prior to accepting his guilty plea that he faced a maximum prison term of [10] years. That turned out to be the sentence imposed. [Jose's] plea was thus voluntary, and the strictures of the due process clause as to this point were satisfied." Id.

In this case it is clear that nothing at the April 26, 1999,

---

[8]In Pearson, this court rejected the nearly identical argument that a guilty plea was involuntary because "he was not informed, prior to entry of his plea, of the applicability of the Guideline § 4B1.1 career offender enhancement [and because] his decision to enter it was based on the expectation that he would not be sentenced as a career offender." 910 F.2d at 222.

sentencing hearing rendered the November 24, 1998, guilty plea involuntary.[9]  Due process requires adequate notice to the defendant of the possibility of sentence enhancement based on relevant conduct to ensure that he has an opportunity to timely contest the propriety of the enhancement.  See Pearson, 910 F.2d at 223.  A PSR provides the requisite notice if it concludes that the defendant qualifies for the enhancement and recommends that the guideline enhancement be applied.  See id.  In this case, the PSR provided just such notice as it listed discrete facts supporting its conclusion that the relevant drug conspiracy conduct was established by a preponderance of the evidence.  See id.  Also, the PSR cited this conclusion as the basis for its recommendation that the § 2K2.1(c) enhancement be applied, and Jose filed written objections to the PSR that were orally renewed at the sentencing hearing.

In the sentencing colloquy the district court fairly distinguished the charged offense to which Jose had pleaded guilty from the uncharged offense which, as relevant conduct, could impact the severity of the punishment imposed for the gun possession

---

[9]A statutory provision that increases the maximum penalty and a guideline enhancement that merely adjusts the penalty within the prescribed range are very different creatures.  "A defendant is entitled to notice of the applicability of the former prior to entry of a guilty plea.  Due process does not mandate, however, either notice, advice, or a probable prediction of where, within the statutory range, the guideline sentence will fall."  See Pearson, 910 F.2d at 223 (citing United States v. Jones, 905 F.2d 867 (5th Cir. 1990); United States v. Fernandez, 877 F.2d 1138 (2nd Cir. 1989); United States v. Salva, 902 F.2d 483 (7th Cir. 1990)).

conviction, but that would not itself serve as a basis of punishment above and beyond the range for the charged offense. Indeed, prior to announcing the sentence the district court adequately phrased the distinction when it declared that Jose would only be punished for the weapons charge though the drug offense was "related and connected." Given the context of the entire colloquy, we conclude that, by stating that the drug charge will "not in a real sense increase your punishment," the district court fairly indicated only the continuing efficacy of the statutory maximum of ten years imprisonment. Moreover, Jose, represented by counsel, declared that he understood the distinction. Accordingly, we conclude that Jose was accorded a full measure of due process with respect to the sentence enhancement.

## III. Conclusion

For the foregoing reasons, the judgment of conviction and the sentence imposed are AFFIRMED.